MYERS, P.J.,
 

 for the Court.
 

 ¶ 1. Barry Ray Wright was convicted in the Circuit Court of Monroe County of fondling and was sentenced to a term of fifteen years in the custody of the Mississippi Department of Corrections, with ten years suspended and five years on post-release supervision. Aggrieved, Wright appeals, arguing: (1) the jury was not fair and impartial; (2) he received ineffective assistance of counsel; and (3) the trial court erred in denying his motion for a judgment notwithstanding the verdict or, alternatively, a new trial. Finding no error, we affirm.
 

 FACTS
 

 ¶ 2. In March 2004, Wright resided with his wife, Lisa Wright, and two stepdaughters, eleven-year-old A.B. and her five-year-old sister.
 
 [1]
 
 On March 22, 2004, Lisa’s eleven-year-old niece X.Y. spent the night with the family. Testimony at trial was unanimous that during the night, Wright, A.B., and X.Y. slept in the same bed. Later that night X.Y. left the bed, woke Lisa, and told her that Wright had touched her breasts inappropriately. When Lisa confronted him, Wright denied the allegation, maintaining that he had been asleep. He apologized to X.Y., telling her that if he had touched her, he had done it inadvertently in his sleep. The details and surrounding circumstances of the incident were disputed. The case went to trial on February 25, 2008.
 

 ¶ 3. X.Y. testified for the State that at approximately midnight, she and A.B. were watching television in the living room when Wright returned home from work. Wright watched television with the girls, then joined a “word game” that the two had been playing. X.Y. explained that she or A.B. would “scramble up” the letters of a word, and the other would attempt to deduce the original word. X.Y. testified that several of the words Wright scrambled were “cuss words.” She specifically remembered two words, which Wright spelled with the letters “D-A-M-N” and “A-S-S.”
 

 ¶ 4. The three then went to A.B.’s bedroom where they talked “about boyfriends and current things that were going on.” A.B. then left to change her clothes, and when she returned, X.Y. commented that her “boobs didn’t fill out her shirt.” A.B. testified that Wright then said to her, “Well, yours would.” The discussion then turned to “shooting tequila,” but X.Y. could not recall who broached the subject. Wright then instructed A.B. to retrieve a shot glass, a wine cooler, salt, and a lemon from the kitchen. Wright and A.B. then demonstrated how to “shoot” the wine cooler, and X.Y. drank some as well before
 
 *449
 
 the game was interrupted by the apparent sound of Lisa moving through the house.
 

 ¶ 5. The trio did not resume drinking, but they instead returned to the living room to watch television. Some time later, the girls retired to A.B.’s room for the night. X.Y. testified: “[W]e went into her bedroom, and then [Wright] walks to the dooiway and asks if we mind if he sleeps with us since Aunt Lisa is already in bed. He didn’t want to wake her up. And we both said that it would be okay.” X.Y. testified that at the time of the incident, she was wearing “a kind of big V-neck shirt,” pajama pants, and undergarments. She then described the incident:
 

 Well, we’re laying [sic] in bed. I’m on my side by the window, and [A.B.] is in the middle on her stomach, and [Wright] is on his side by the edge of the bed. And we’re trying to go to sleep, and [A.B.] falls asleep and [Wright] is rubbing her back. And then he starts rubbing my hand, and I had my eyes closed. And then he is rubbing my arm and then he goes back to my hand, and I said, “That tickles,” and I open my eyes and I see that he is awake.
 

 And then he starts rubbing my back and my shoulder, and then he goes down my shirt into my bra and starts massaging my breasts....
 

 She continued:
 

 Well, I had opened my eyes, and I closed them really quick. And I thought to myself, “I’ve got to get up and get out.” So I say [sic], “I’ve got to go to the bathroom,” and he’s like, “Okay.” So I went through the bathroom, which leads into Aunt Lisa’s room, and I woke Aunt Lisa up and told her that [Wright] had put his hand down my shirt.
 

 On cross-examination, X.Y. admitted that she had not mentioned that she, A.B., and Wright had consumed alcohol that night until several years after the incident.
 

 ¶ 6. Lisa testified that she and A.B.’s five-year-old sister had gone to bed between 10:30 and 11:00 p.m. on the night of the incident. The next thing she recalled was X.Y. coming into her room, between 1:00 and 1:30 a.m., saying that she was scared because Wright had touched her breasts. Lisa then entered A.B.’s room, told A.B. to go into her bedroom, and confronted Wright. Lisa testified:
 

 I told — I woke — well, I called his name twice, and he said, “What?” And I told him what [X.Y.] had said, that he touched her breasts, and asked him why he had done it. And he said, “If I did, it must have been an accident. I must have done it in my sleep.” He said, “I didn’t mean to do it.”
 

 On cross-examination, Lisa stated that she filed for divorce from Wright on April 30, 2004, approximately five weeks after the incident. She acknowledged that the day following the incident, X.Y. asked to spend the night again. She also testified:
 

 Q. Okay. And did she tell you [that] she thought this could have been an accident?
 

 A. I asked her — when [Wright] said that to me, I went back and, you know, I said, “He said it must have been an accident. He was asleep.” I said, “Could it have been?”
 

 And she said, “Well, I guess it could have been.”
 

 Lisa also testified that she could not see what Wright was wearing when she initially confronted him in A.B.’s bedroom, but when she spoke with him in her bedroom, he was wearing only pajama bottoms.
 

 ¶ 7. The State called several other witnesses. A.B.’s recollection of the events of that night was generally consistent with X.Y.’s testimony. A.B. acknowledged that she fell asleep while Wright massaged her back, prior to the incident. She also could
 
 *450
 
 not say if X.Y. was awake when she herself fell asleep. X.Y.’s mother testified that X.Y. told her of the incident at approximately noon the next morning. She recalled:
 

 [X.Y.] said they had been watching a show in [A.B.]’s room, and they had been lying in the bed. And they had been fully dressed on top of the cover and that they had — [Wright] had asked if he could come in there and lay [sic] with them and watch TV, and they said yes, and that they fell asleep and that she woke up with [Wright]’s hand down her shirt and under her bra, massaging her breasts.
 

 On cross-examination, she stated that she first reported the incident to the authorities after she sought counseling for X.Y., approximately two weeks after it occurred. On redirect, she explained that X.Y. did not tell her about the “word game” and the drinking until June 2007.
 

 ¶ 8. The State also called Melissa Ratliff, who was qualified as an expert in forensic interviewing. She testified that she conducted such an interview with X.Y. on April 12, 2004. A video recording of the interview was shown to the jury. As a result of the interview, Ratliff concluded that X.Y.’s statements were consistent with child sexual abuse.
 

 ¶ 9. Wright elected to testify in his own defense. He testified that he had arrived home on the day of the incident between 1:30 and 2:00 p.m. Lisa came home between 3:00 and 3:30 p.m. with the children, and they ate dinner and watched television until 10:30 or 11:00 p.m. Lisa then asked Wright to “try to get [A.B.] and [X.Y.] to go to sleep” while she put AB.’s five-year-old sister to sleep in the couple’s bed. He then fell asleep and slept, fully clothed, with A.B. and X.Y., until he was awakened between 3:30 and 4:00 the next morning by Lisa, who told him that he had touched X.Y. inappropriately. He denied that he had consumed alcohol or given it to the girls, averring that he did not keep alcohol in his home. He also denied playing a “word game” or dress-up with the girls on the night of the incident. He testified that X.Y. “threw a temper tantrum, a fit” the day after the incident when she was told that she would not be allowed to spend the following night at the Wright home.
 

 ¶ 10. The defense also called Steven Cox, an employee of the Monroe County Department of Human Services, who testified that on April 1, 2004, he interviewed A.B. He testified:
 

 [A.B.] did tell me at that time that [X.Y.] was upset and felt like [Wright] had touched her in an inappropriate way. But she had talked with [X.Y.] and basically trying to calm her down [sic] and told her that she thought that it was probably an accident and that she did not think that [Wright] had any intentions of touching her in that way.
 

 Cox also testified that A.B. stated during the interview that she had been awake at the time of the incident.
 

 ¶ 11. The jury subsequently convicted Wright of fondling, and the trial court denied his motion for a JNOV or, alternatively, a new trial. He now appeals his conviction and sentence, asserting three errors.
 

 DISCUSSION
 

 I. Fair and Impartial Jury
 

 ¶ 12. Wright argues that the trial court denied him a trial by a fair and impartial jury when it did not strike juror two on its own motion. During voir dire, juror two stated: “I am acquainted with [X.Y.’s mother] and have been for about a year. She periodically attends our church. I know who she is, but I’m not a close personal friend, but you need to know that
 
 *451
 
 I am aware of who that person is.” On further examination, he stated that he was “not familiar with [X.Y.] at all.” Juror two further stated that notwithstanding his acquaintance with XY.’s mother, he “can be unbiased.” When asked, “Is there anything about the fact that [XY.’s mother] attends the same church that you do that would influence your decision one way or the other in this case either for or against the position that she may take,” he responded in the negative. Juror two was not questioned further and was ultimately seated on the jury without objection from Wright.
 

 ¶ 13. On appeal, Wright argues that the trial court erred in not striking juror two on its own motion. However, the supreme court has held that “[pjrocedurally, a party’s failure to object to a juror’s competency to sit before the jury was empaneled constitutes, based on unequivocal principles, a procedural bar.”
 
 Archer v. State,
 
 986 So.2d 951, 958(¶28) (Miss.2008) (citing
 
 Myers v. State,
 
 565 So.2d 554, 557 (Miss.1990)). The supreme court has stated, however:
 

 In limited circumstances, this Court will set aside the procedural bar and reverse when it is clear that a juror disqualified under Mississippi Code Annotated [section 18-5-67 was not removed before the jury retired to consider its verdict. Essentially, this requires a showing that the juror in question has been convicted of an “infamous crime” or has withheld information or misrepresented material facts that would have provided a legitimate basis for challenge.
 

 Id.
 
 (internal citations omitted). Wright has not argued either exception to the procedural bar, and the record contains no evidence of either exception. Accordingly, this issue is procedurally barred.
 

 ¶ 14. Notwithstanding the procedural bar, this assignment of error fails on the merits. The supreme court has stated:
 

 [U]nder Mississippi law, any person not disqualified under Mississippi Code Annotated [s]ection 13-5-1, who will make oath that he or she is impartial, is competent to sit as a juror in a criminal case. The trial judge whose duty is to see that a competent, fair, and impartial jury is empaneled, is empowered with broad discretion to determine whether a prospective juror can be fair and impartial-notwithstanding the juror’s admission under oath that he or she will be. This Court recognizes that the trial judge is in the best position to determine whether the jury as selected was fair and impartial, and therefore yields to a trial court’s discretionary finding that a competent jury, under its oath to be fair and impartial, was empaneled to render judgment, and will not reverse absent clear- abuse of that discretion.
 

 Id.
 
 at 958-59(¶ 30) (internal citations omitted). Juror two stated that notwithstanding his acquaintance with XY.’s mother, he would be unbiased and would decide the case based solely on the law and evidence. Wright “has failed to show why the trial court’s belief in the juror’s oath to remain fair and impartial throughout was error.”
 
 Id.
 
 at 959(¶ 31). This assignment of error is without merit.
 

 II. Ineffective Assistance of Counsel
 

 ¶ 15. Wright argues that he received constitutionally ineffective assistance of counsel. In particular, he cites defense counsel’s failure to challenge juror two for cause. He also alleges that his attorney failed to properly disclose to the State a logbook which indicated that, on the night of March 22, 2004, Wright was traveling outside the State of Mississippi. As a result, Wright alleges the trial court excluded the logbook and he was forced to
 
 *452
 
 pursue an alternate theory of his defense. Mississippi Rule of Appellate Procedure 22(b) states:
 

 Issues which may be raised in post-conviction proceedings may also be raised on direct appeal if such issues are based on facts fully apparent from the record. Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings.
 

 ¶ 16. The facts concerning Wright’s allegations regarding the logbook are simply not developed in the record before this Court. If the trial court did exclude the logbook, the arguments of counsel and the ruling of the trial court do not appear in the record, which indicates only that a bench conference was held outside the hearing of the court reporter. The logbook was not proffered and does not appear in the record. The facts upon which Wright has based this issue are not “fully apparent from the record.” We therefore decline to address this issue on direct appeal.
 

 III. Motion for a JNOY or, Alternatively, a New Trial
 

 ¶ 17. Review of the denial of a motion for a JNOV or, in the alternative, a new trial invokes both the sufficiency and the weight of the evidence.
 
 See Bush v. State,
 
 895 So.2d 836, 843-44 (¶¶16, 18) (Miss.2005). Although Wright appears to address only the sufficiency of the evidence in his brief, we shall address both issues.
 

 A. Legal Sufficiency
 

 ¶ 18. The supreme court has stated that “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.’ ”
 
 Id.
 
 at 843(¶ 16) (quoting
 
 Carr v. State,
 
 208 So.2d 886, 889 (Miss.1968)). The supreme court cautioned, however, that:
 

 this inquiry does not require a court to “ ‘ask itself whether
 
 it
 
 believes that the evidence at the trial established guilt beyond a reasonable doubt.’ Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 

 Id.
 
 (quoting
 
 Jackson v.
 
 Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The supreme court continued:
 

 Should the facts and inferences considered in a challenge to the sufficiency of the evidence “point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,” the proper remedy is for the appellate court to reverse and render. However, if a review of the evidence reveals that it is of such quality and weight that, “having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,” the evidence will be deemed to have been sufficient.
 

 Id.
 
 (internal citations omitted).
 

 ¶ 19. Wright was charged with fondling, pursuant to Mississippi Code Annotated section 97-5-23(1) (Rev.2006). Wright argues that the State failed to prove an essential element of the offense — that he touched X.Y. “for the purpose of gratifying
 
 *453
 
 his ... lust, or indulging his ... depraved licentious sexual desires.”
 

 ¶ 20. The supreme court has stated that “all the proof need not be direct and the jury may draw any reasonable inferences from all the evidence in the case.”
 
 Campbell v. State,
 
 278 So.2d 420, 423 (Miss.1973). Thus, intent may be proven by circumstantial evidence.
 
 Stinson v. State,
 
 375 So.2d 235, 236 (Miss.1979). Indeed, as the supreme court has stated: “If intent required definite and substantive proof, it would be almost impossible to convict, absent facts disclosing a culmination of the intent. The mind of an alleged offender, however, may be read from his acts, conduct, and inferences fairly deducible from all the circumstances.”
 
 Newburn v. State,
 
 205 So.2d 260, 265 (Miss.1967) (quoting 13 Am.Jur.2d
 
 Burglary
 
 § 52 (1964)).
 

 ¶ 21. Wright cites
 
 Bradford v. State,
 
 736 So.2d 464 (Miss.Ct.App.1999), in support of his argument. There, we reversed and rendered a conviction for gratification of lust because the touching at issue took place in a ear crowded with children and involved “contact of only the briefest duration consisting of a pinch that was followed by a laughing attempt to place the blame for the contact on one of the other children.”
 
 Id.
 
 at 466(¶ 10). There was no evidence “of any attempt to grope or rub either of the children in a sexually suggestive manner” or that the defendant “was unnaturally aroused or sexually excited by this seemingly prankish behavior.”
 
 Id.
 
 The holding of
 
 Bradford,
 
 is consistent with our general law regarding criminal intent — absent direct proof of the defendant’s intent, the circumstances of the touching must be sufficient for a reasonable jury to infer it was done to satisfy his lustful desires.
 
 See Ladnier v. State,
 
 878 So.2d 926, 930(¶ 12) (Miss.2004);
 
 Bradford,
 
 736 So.2d at 466(¶ 9).
 

 ¶ 22. Wright’s version of the events was that he either did not touch the victim’s breasts, or he did so as he slept. However, our standard of review requires us to view the evidence in the light most favorable to the prosecution. Doing so, as we must, we find that the circumstances of the instant case were sufficient for a reasonable jury to infer that Wright’s intent in touching X.Y. was to satisfy his lustful desires. X.Y.’s testimony was that prior to lying down in bed with the girls, Wright gave them alcohol and used adult language in their word game. He then made a comment about her breasts. Once in the bed, X.Y. testified that Wright was awake when he reached across the bed, over his stepdaughter, and rubbed X.Y’s shoulders and arms before gradually working his hand underneath her shirt and undergarments. He then massaged her breasts in a way that, based on her description and subsequent actions, was clearly inappropriate. This issue is without merit.
 

 B. Weight of the Evidence
 

 ¶ 23. The supreme court also discussed appellate review of the weight of the evidence supporting a jury’s verdict, stating:
 

 When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.... However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Rather, as the “thirteenth juror,” the court simply disagrees with the jury’s resolution of the conflicting testimony. This difference of opinion does
 
 *454
 
 not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
 

 Btish,
 
 895 So.2d at 844(¶ 18) (internal citations and quotations omitted). In reviewing the evidence we have discussed above, we acknowledge that Wright raised some genuine concern regarding the evolution of the testimony against him. Nonetheless, on our review of the record we cannot say that this renders the verdict “so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” This is-, sue is without merit.
 

 ¶ 24. THE JUDGMENT OF THE MONROE COUNTY CIRCUIT COURT OF CONVICTION OF FONDLING AND SENTENCE OF FIFTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TEN YEARS SUSPENDED AND FIVE YEARS OF POST-RELEASE SUPERVISION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . To protect minor victims of sexual abuse, we substitute fictitious initials for their names.