MAXWELL, J.,
for the Court.
¶ 1. Fonshanta Anthony was convicted in Marshall County Circuit Court of felony child abuse and sentenced to twenty years’ imprisonment in the custody of the Mississippi Department of Corrections (MDOC). On appeal, Anthony argues: (1) the circuit court erred in admitting a medical report entitled “Abuse/Neglect Risk Factor Assessment” (abuse record); (2) the evidence was insufficient as a matter of law to sustain her conviction of felony child abuse; and (3) the verdict is against the overwhelming weight of the evidence.
¶ 2. Finding no reversible error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 3. A Marshall County grand jury charged Anthony with felony child abuse. Specifically, the indictment alleged that Anthony intentionally burned her nine-month-old infant son, B.A.[1] While Anthony’s reports of the incident vary, expert medical testimony established that B.A. was forcefully held down in scalding bath water and sustained graphic burn injuries to over sixty percent of his body. The severe burns caused much of B.A.’s skin to fall off, and required skin grafts to over fifty percent of his body. The only people present at the time B.A. was burned were B.A.’s mother, Anthony, and B.A.’s two-year-old brother, J.A.
¶4. The events underlying the felony-child-abuse charge took place on July 18, 2005, in Byhalia, Mississippi. That night, Anthony brought B.A. to her neighbor Cassandra Watkins’s apartment, and asked Watkins to call 911. Anthony attempted to hand B.A. to Watkins, but Wat *614 kins refused to hold the injured child, and instead called 911. Watkins testified B.A. was screaming, his skin was falling off, and he was bleeding. Anthony told Watkins that J.A. had turned the hot water on B.A.
¶ 5. Officer David Taylor of the Byhalia Police Department was the first law enforcement officer on the scene. Ambulance personnel arrived about the same time. Taylor testified that he heard B.A. screaming the whole time he was being attended to by paramedics and observed that B.A. was obviously in pain.
¶ 6. Officer Clyde Gunter of the Byhalia Police Department arrived when paramedics were preparing B.A. to be airlifted to Le Bonheur Hospital in Memphis, Tennessee. He was told B.A. was in critical condition and had been burned in the bathroom upstairs in Anthony’s apartment. Officer Gunter looked in Anthony’s tub and noted it was empty. He testified that it looked like a washcloth had been used to stop water from draining from the tub. Officer Gunter found brown pieces of B.A.’s skin in the tub. He then inspected the hot water heater and discovered the temperature was set at approximately 160 degrees. After investigating the apartment, Officer Gunter overheard Anthony telling a companion: “I wouldn’t do anything deliberately to hurt my child.” B.A. was then transferred by helicopter to Memphis.
¶ 7. In Anthony’s initial statement to police, she claimed she ran bath water and placed her two-year-old son, J.A., in the tub. She then left her apartment to take trash to a garbage dumpster. When she returned she placed B.A. in the tub with J.A. At that point, Anthony claimed she left both children in the bathtub unsupervised and went to their room to gather night-time clothes. Anthony explained she then heard water running and yelled to her two-year-old son, J.A., to turn it off. According to Anthony, J.A. stated that B.A. had “boo booed” in the tub. When Anthony walked into the bathroom, she noticed pieces of B.A.’s skin were floating in the tub. She then pulled him out of the water.
¶ 8. While at Le Bonheur Hospital in Memphis, Anthony told a different story. There she claimed she hád placed both J.A. and B.A. in the back of the bathtub, and then left the apartment to take out the garbage to a dumpster. She maintained that B.A. had moved from the back of the tub to the front of the tub, and J.A., her two-year-old son, turned on the hot water. A treating physician who examined B.A. at Le Bonheur Hospital made a notation in the records that “the injuries do not fit the explanation given” by Anthony.
¶ 9. B.A.’s burns were so severe that on July 19, 2005, he had to be transported to Shriners Hospital for Children in Galveston, Texas, which specializes in treating burned children. At Shriners Hospital, Anthony gave a third slightly different version of the events giving rise to B.A.’s burns. Anthony told a treating psychologist she had placed J.A. alone in the tub prior to taking the trash to the dumpster. She also claimed that upon her return, she placed B.A. in the back of the tub, and then left the bathroom to get the children’s night-time clothes. Anthony reported she heard the water turn on, and it ran for approximately thirty to sixty seconds, and then “cut off.” When the water was turned off, she heard J.A. yell that B.A. had used the bathroom in the tub. Anthony indicated B.A. was sitting in the front of the bathtub, in a relaxed position under the faucet, and J.A. was standing directly behind B.A. in the tub. She also claimed B.A. was not crying at this time, but she noticed “brown stuff’ floating in the tub. According to Anthony, the water was one to two inches deep and was not hot to the *615 touch. She noticed B.A.’s skin was pink, so she pulled him out of the tub and called 911.
¶ 10. A few days after the burning incident, Anthony reported essentially the same version she had given at Shriners Hospital to Patricia Amosike of the Marshall County Department of Human Services (DHS). Specifically, she told Amo-sike that J.A. was in the tub with B.A. when Anthony returned to the bathroom and found B.A. burned.
¶ 11. Amosike conducted a physical examination of J.A. the day after the burning incident, but found no burns on J.A.’s body. Amosike found the lack of any sign of burns on J.A. to contradict Anthony’s account that both children were in the tub together when B.A. sustained his devastating burns.
¶ 12. Without objection from Anthony, the circuit court accepted Dr. Art Sanford of Shriners Hospital as an expert in the field of “general surgery including burn injuries and pediatric burns and related fields.” Dr. Sanford treated B.A. at Shri-ners Hospital. He testified that over sixty percent of B.A.’s body was burned, and that B.A. had sustained “full thickness burns,” which are burns that do not heal, on fifty percent of his body.
¶ 13. Doctors performed five surgeries on B.A. during his one-month stay at Shri-ners Hospital. In between B.A.’s surgeries, B.A. required almost daily scrubbing of his damaged areas to remove dead skin. Over fifty percent of B.A.’s body required skin grafts. Dr. Sanford also explained B.A. will require additional operations to restore function to his hands and feet. Because the skin grafts will not grow at the same rate as B.A.’s body, he will also have to undergo regular surgeries to release the grafts.
¶ 14. According to Dr. Sanford, B.A.’s burns were straight-line demarcation burns, meaning they were in a straight line around his torso and continued from his chest down. He also testified a child B.A.’s age would not sit still in scalding water, and would have flailed around in the water to avoid being burned. In Dr. Sanford’s opinion, flailing would have resulted in burns unlike those found on B.A.’s body.
¶ 15. Dr. Sanford also noted the burns on B.A.’s extremities were mirror-image burns, meaning that each arm and leg was very similarly burned, consistent with a victim being held down in scalding water. Furthermore, Dr. Sanford testified that the burns were of uniform depth, which showed B.A.’s entire lower body was exposed to the same amount of water at the same temperature for the same length of time. In Dr. Sanford’s opinion, the uniform depth of the burns was consistent with forced immersion. He also noted B.A. had donut-shaped scars on his buttocks and areas of spared skin in the groin and wrist areas — additional signs of forced immersion.
¶ 16. Dr. Sanford noticed during B.A.’s hospital stay that there was a concern among his staff that B.A. was more agitated and less comfortable in the presence of his mother than with the hospital caregivers.
¶ 17. Dr. Sanford was also troubled by Anthony’s inconsistent explanations of how the burn occurred. He found it was highly suspicious that some of Anthony’s accounts placed J.A. in the tub with B.A. In his opinion, had J.A. been in the tub as well, he would have also sustained injuries. Dr. Sanford also opined it was unlikely a two-year-old child would have the fine motor skills to turn on the hot-water faucet. Dr. Sanford maintained that had hot water been turned on while B.A. was in the tub, he would have exhibited a spectrum or *616 varying degrees of burns, rather than the uniform burns he sustained.
¶ 18. Dr. Sanford testified that in his expert opinion, B.A. was intentionally burned and had been “folded up” and placed in the hot water. As Dr. Sanford put it, B.A. would have had to have been held down, and “[t]here [had] to be force pushing his chest, his torso forward with him in a sitting position.”
DISCUSSION
I. Admission of the Abuse Record
¶ 19. Anthony does not take issue with the trial court’s acceptance of Dr. Sanford as an expert witness in the field of pediatric burns. Instead, her assignments of error are mostly centered around the admission, during the State’s direct examination of Dr. Sanford, of the abuse record created by B.A.’s caregivers at Shriners Hospital. First, she argues the circuit court erred in admitting the abuse record because it contained inadmissible hearsay, which she claims was highly prejudicial. Second, she argues admission of the record violated the Confrontation Clause of the United States Constitution. Third, she claims admission of the record exceeded the scope of Rules 702 and 703 of the Mississippi Rules of Evidence.
¶ 20. We review a trial court’s decision to admit or exclude evidence under an abuse of discretion standard. Smith v. State, 986 So.2d 290, 295(¶ 12) (Miss.2008) (citations omitted). Questions of law are reviewed under a de novo standard of review. DeLoach v. State, 722 So.2d 512, 518(¶ 25) (Miss.1998) (citations omitted).

A. Hearsay

¶ 21. First, Anthony claims the circuit court erred in admitting the abuse record because it contained inadmissible hearsay. The State contends that the court properly admitted it under a hearsay exception. There are essentially two types of statements contained in the abuse record: (1) the histories provided by B.A.’s mother, Anthony, and recorded in the abuse record; and (2) the statements of B.A.’s caregivers at Shriners and Le Bonheur Hospitals. Dr. Sanford participated in the completion of the abuse record and contributed to all medical/physical findings contained in the report.[2] The remaining psychologieal/soeial aspects of the report were completed by Shriners Hospital psychologists, who were also on B.A.’s medical-care team. The abuse record was signed by B.A.’s treating psychologist, Dr. Laura Rosenberg, as well as a psychology intern, Amy Brookover.
¶ 22. When the State attempted to admit the abuse record at trial, the circuit court asked if it was a “regularly kept record for the treatment” of B.A. Upon receiving an affirmative answer from Dr. Sanford, the judge admitted the document without citing a specific hearsay exception. From his question about Shriners Hospital’s record-keeping activities, the circuit judge may have intended to admit the report under Mississippi Rule of Evidence 803(6) — the business records exception. Though the circuit court’s reasoning is not preserved for our review, the State contends the court properly admitted the abuse report under this exception.
¶ 23. Mississippi Rule of Evidence 801(c) defines hearsay as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Hearsay evidence is *617 not admissible unless it falls within an exception provided by law. M.R.E. 802.
¶24. Here, the abuse record clearly meets the definition of hearsay, so its admissibility hinges on whether a hearsay exception applies.[3] We bear in mind that a circuit court’s proper admission of evidence is not reversible error, even where the circuit court admits the evidence for the wrong reason. Evans v. State, 919 So.2d 231, 285(1112) (Miss.Ct.App.2005) (citing Puckett v. Stuckey, 638 So.2d 978, 980 (Miss.1993)); Jackson v. State, 811 So.2d 340, 342(¶ 6) (Miss.Ct.App.2001) (citation omitted).
¶ 25. While the abuse record is perhaps admissible under Rule 803(6), we find the exception rooted in Rule 803(4) more applicable. Rule 803(4) exempts “Statements for Purposes of Medical Diagnosis and Treatment” from the otherwise stringent prohibition against hearsay, regardless of the availability of the declarant. M.R.E. 803(4). Specifically, Rule 803(4) provides that the following statements are exempted from the hearsay rule:
Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment, regardless of to whom the statements are made, or when the statements are made, if the court, in its discretion, affirmatively finds that the proffered statements were made under circumstances substantially indicating their trustworthiness. For purposes of this rule, the term “medical” refers to emotional and mental health as well as physical health.
¶ 26. Mississippi courts recognize a two-part test for the admission of evidence under Rule 803(4). “First, ‘the declarant’s motive in making the statement must be consistent with the purposes of promoting treatment,’ and second, ‘the content of the statement must be such as is reasonably relied on by a physician in treatment.’” Osborne v. State, 942 So.2d 193, 197-98(¶ 15) (Miss.Ct.App.2006) (quoting Davis v. State, 878 So.2d 1020, 1024(¶ 12) (Miss.Ct.App.2004)).
¶ 27. Rule 803(4) applies to statements made to non-medical personnel, including psychologists. In re S.C. v. State, 795 So.2d 526, 530(¶ 15) (Miss.2001); Davis v. State, 878 So.2d 1020, 1023-24 (¶¶7, 13) (Miss.Ct.App.2004); see also M.R.E. 803(4) cmt. This exception also allows for the admission of “statements which relate to the source or cause of the medical problem.” Foley v. State, 914 So.2d 677, 683 n. 1 (Miss.2005) (citing M.R.E. 803(4) cmt.).
¶28. In the present case, the abuse record was completed by B.A.’s caregivers at Shriners Hospital. Dr. Sanford testified that a physician would have requested the abuse record be composed. He also testified that the record was compiled during B.A.’s care, and that he would have personally participated in preparing the document. The record, he also explained, was a part of B.A.’s overall physical exam findings when B.A. arrived at Shriners Hospital; therefore, it was made for the purpose of promoting B.A.’s treatment.
¶ 29. Mississippi appellate courts have routinely held in instances where a child has suffered abuse at the hands of another household member, part of the treatment *618 of the child is to make certain the child is not returned to the abuser. Rowlett v. State, 791 So.2d 319, 321 (¶ 4) (Miss.Ct.App. 2001) (citing Hennington v. State, 702 So.2d 403, 415(¶ 49) (Miss.1997)). In Rowlett, we noted “[t]he scope of [Mississippi Rule of Evidence 803(4) ] has been specifically held to include the identification of the purported abuser under the theory that a part of the treatment of a[n] ... abused child includes reasonable efforts to eliminate the abuser’s access to the child.” Id.
¶ 30. Here, Dr. Sanford testified that an important part of B.A.’s treatment was to ensure he would be discharged to a safe environment. In fact, Dr. Sanford, in laying the foundation for the admission of the abuse record, testified that the psychologists who prepared the abuse record “have an interest in both patient and family and identifying ... who is at risk for injury, [and] who is at risk for having a second burn injury to prevent recurrences.”
¶ 31. Our supreme court recently held that Rule 803(4) “casts its net wider than the patient-physician relationship” and extended its scope to include statements by the patient’s mother to treating physicians. Valmain v. State, 5 So.3d 1079, 1088(¶ 14) (Miss.2009) (citation omitted). In addressing the scope of Rule 803(4), the supreme court noted that the majority of state and federal courts that have confronted the question have held statements to doctors and therapists by a parent of an injured child qualify as statements for the purpose of medical diagnosis or treatment. Id. at 1083-84(¶ 15). “The fact that information obtained via a medical history comes from the patient’s mother ‘does not affect the admissibility of the statements therein.’ ” Id. at 1084(¶ 15) (quoting Sandoval v. State of Texas, 52 S.W.3d 851, 857 (Tex.App.2001)).
¶ 32. In Valmain, the supreme court also discussed the guidelines set forth in Hennington relating to the admission of hearsay evidence in sexual abuse cases, stating:
[H]earsay testimony identifying the perpetrator is admissible under Miss. R. Evid. 803(4) regardless of whether he or she is a member of the child’s immediate household. The overriding question making the inquiry necessary is, “Will the perpetrator have access to the child in the future that would allow the sexual abuse to continue?” Because the inquiry is necessary for treatment, the answer is admissible under the rule.
Id. at 1084(¶ 20) (quoting Hennington, 702 So.2d at 415(¶49)). The supreme court also noted that “the paramount concern in treatment of sexual abuse is to ensure that a child is not returned to the environment that fostered, allowed, or permitted the abuse.” Id. (quoting Hennington, 702 So.2d at 414-15(¶ 48)). Though Valmain concerned sexual abuse, we find its rationale extends to other forms of intentional child abuse, such as burns.
¶ 33. In the case at hand, B.A. was sent to Shriners Hospital for one specific reason — the treatment of his critical burn injuries. In fact, Dr. Sanford testified the abuse record was part of Shriners Hospital’s analysis to treat B.A. and determine whether he could safely return home. While B.A. was in the care of Shriners Hospital, a team of healthcare providers, including medical students, physician extenders, nurse practitioners, physician assistants, psychiatrists, and therapists met twice a week to discuss B.A.’s medical care. Dr. Sanford explained that when treating burn patients, the hospital uses the entire team to make certain the patient has a safe place to be discharged. This team is also tasked with evaluating whether the caregiver — here B.A.’s mother, An *619 thony — will be able to meet the needs of the patient upon discharge from the hospital. Dr. Sanford testified that the abuse record was prepared as part of B.A.’s care and treatment provided by Shriners Hospital and was important to their discharge assessment. Thus, the statements of the declarants — Dr. Rosenberg and the referring caregivers — were made for the purpose of treating B.A. and to ensure that he was not returned to an abusive environment. Also, Anthony’s declarations were given to further the treatment of her burned child.
¶ 34. Furthermore, Dr. Sanford made clear that he relied upon the content of the abuse record, which included the varying histories provided by Anthony, to make life and death decisions concerning the proper care and treatment of B.A. While the trial court did not specifically address the applicability of Rule 803(4), we find both elements of the two-part test are present. See Osborne, 942 So.2d at 197-98(¶15). Therefore, we find the statements contained in the abuse record were made for the purpose of medical diagnosis and treatment, and the report was relied upon by Shriners Hospital in treating B.A.
¶ 35. We also find the statements of the treating psychologists concerning the social aspects of the abuse report were admissible. In McClain v. State, 929 So.2d 946, 951(¶ 9) (Miss.Ct.App.2005), the defendant objected to a doctor’s testimony about the treatment of the victim after she had left the doctor’s care. In the doctor’s testimony, he recounted information from his notes, which consisted of his conversations with other treating doctors and his former patient’s medical records. Id. This Court found that these statements made to the testifying doctor by other treating physicians were admissible under Rule 803(4). Id. at 951-52(¶ 11).
¶ 36. Additionally, a Louisiana appellate court, in State v. Thom, 615 So.2d 355, 362-63 (La.Ct.App.1993), interpreted Louisiana’s similar hearsay exception for statements made for the purpose of medical diagnosis or treatment. The court held that hospital records with facts concerning “how the victim’s attack occurred, the victim’s condition, and her treatment” were admissible under this exception. Id. at 363. Similarly, a Tennessee appellate court, in State v. Edwards, 868 S.W.2d 682, 698-99 (Tenn.Crim.App.1993), held that hospital records of a rape victim, which contained statements by medical personnel concerning the victim’s condition and the cause of her injuries, were properly admitted as statements for the purpose of medical diagnosis or treatment.
¶ 37. In the present case, the statements in the abuse report of the psychologists at Shriners Hospital were also made in furtherance of B.A.’s treatment. Thus, they fall within the exception provided in Rule 803(4).
¶ 38. We note that the circuit court failed to make an affirmative finding that the statements in the abuse record were made under circumstances substantially indicating trustworthiness. However, this Court has held that a trial court’s failure to make a finding of “substantial indicia of reliability” under the “tender-years exception,” was not reversible error where there was sufficient evidence in the record supporting a finding of reliability. Sharp v. State, 862 So.2d 576, 580(¶ 15) (Miss.Ct.App.2004). Likewise, we find the circuit court should not be reversed for failure to affirmatively find trustworthiness pursuant to 803(4) under such circumstances. Since, taking the record as a whole, there is sufficient evidence to support a finding of trustworthiness, we find that admission of the abuse record was not reversible error.
*620 ¶ 39. Even if admission of the abuse record or any part of it constituted error, the error was harmless. M.R.E. 103(a). The information in the abuse record was merely cumulative of other evidence produced at trial, including the photographs, Anthony’s other statements, and Dr. Sanford’s testimony. At trial, before the prosecutor even handed Dr. Sanford the report, Dr. Sanford testified based on his own personal knowledge and observation of B.A.’s burns that the patterns were not indicative of an accidental injury. For example, Dr. Sanford stated, “just looking at the burns themselves, it’s of an unusual pattern. It’s a straight line.... [Wjithout any information from anybody, it has a straight[-]line distribution.” He further testified based on his observation of the burns that “[a] typical nine-month-old, if they’re not happy, they’re going to be flailing,” and “there would ... be some response to the burn, you know, to the painful stimuli, so the fact that there’s just a straight line and not varying degrees and a wider distribution of burns makes it suspicious.” Later on in his testimony, Dr. Sanford clearly based his opinion that B.A.’s injury was intentionally inflicted on his review of photographs which were entered into evidence without objection.
¶ 40. Furthermore, Anthony’s explanation of B.A.’s injury in the abuse report largely paralleled the story she told Amo-sike, to which Amosike testified at trial. Thus, the members of the jury learned very little from the abuse record they did not know from other evidence. Because the vast majority of the abuse record was cumulative of other evidence presented at trial, we find any error that resulted from admission of the abuse record to be harmless.

B. Confrontation Clause

¶ 41. Anthony next contends the admission of the abuse record violated her right under the Confrontation Clause of the Sixth Amendment to the United States Constitution. She specifically contends the record conveyed to the jury out-of-court testimonial statements of persons she had no opportunity to cross-examine. However, a general hearsay objection is insufficient to preserve an alleged Confrontation Clause violation for appellate review. Briggs v. State, 16 So.3d 696, 698-99(¶11) (Miss.Ct.App.2008). Since Anthony made no Sixth-Amendment objection to the admission of the abuse record at trial or in her post-trial motion, her arguments on this issue are procedurally barred. Id. But under the plain-error doctrine, “we can recognize obvious error which was not properly raised by the defendant on appeal, and which affects a defendant’s ‘fundamental, substantive right.’ ” Neal v. State, 15 So.3d 388, 403(¶32) (Miss.2009) (citing Smith, 986 So.2d at 294(¶ 10)). “The plain[-]error doctrine has a two-part test which requires: (i) an error at the trial level and (ii) such an error resulted in a manifest miscarriage of justice.” Stephens v. State, 911 So.2d 424, 432(¶ 19) (Miss.2005) (citing Gray v. State, 549 So.2d 1316, 1321 (Miss.1989)). Thus, we will review this issue for plain error.
 ¶ 42. The Confrontation Clause provides that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]” U.S. Const, amend. VI. The United States Supreme Court has found:
there are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country’s constitutional goal.
*621 Smith, 986 So.2d at 296(¶ 19) (quoting Lee v. Illinois, 476 U.S. 580, 540, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986)). The right of a defendant to confront a witness:
(1) insures that the witness will give his statements under oath — thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the “greatest legal engine ever invented for the discovery of truth”; [and] (3) permits the jury that is to decide the defendant’s fate to observe the demeanor of the witness making his statement, thus aiding the jury in assessing his credibility.

Id.

¶ 48. In Crawford v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Confrontation Clause bars the admission of out-of-court testimonial statements of a witness unless he is unavailable to testify and the defendant had a prior opportunity to cross-examine him. It is now well-established law that “only testimonial hearsay is capable of violating the Sixth Amendment.” Neal, 15 So.3d at 403(¶ 34) (citing Crawford, 541 U.S. at 68, 124 S.Ct. 1354). Underlying the exclusion of testimonial out-of-court statements is the fact that “[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.” Crawford, 541 U.S. at 51, 124 S.Ct. 1354. Also, “[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse.” Id. at 56 n. 7, 124 S.Ct. 1354.
¶ 44. The Crawford Court held that the term “testimonial” “applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.” Id. at 68,124 S.Ct. 1354. However, the Supreme Court left “for another day any effort to spell out a comprehensive definition of ‘testimonial.’ ” Hobgood v. State, 926 So.2d 847, 852(¶ 12) (Miss.2006) (quoting Crawford, 541 U.S. at 68, 124 S.Ct. 1354). However, the Mississippi Supreme Court, applying Crawford, has held: “[A] statement is testimonial when it is given to the police or individuals working in connection with the police for the purpose of prosecuting the accused.” Neal, 15 So.3d at 404(¶ 35) (citing Hobgood, 926 So.2d at 852).
¶ 45. In Hobgood, the supreme court found a child-abuse victim’s statements to a treating psychotherapist and pediatrician at the hospital were not testimonial under Crawford and did not trigger the protection of the Confrontation Clause. Hob-good, 926 So.2d at 851(¶ 13). The supreme court explained:
These individuals were not working in connection with the police. Further, their statements were not made for the purpose of aiding in the prosecution.... [T]he purpose of these statements was to seek medical and psychological treatment. The victim was taken to [the psychotherapist and pediatrician] at the family’s request and not sent there by police to further their investigation.
Id. Although Anthony argues the abuse record was testimonial because it was required under Texas law, we find the abuse record was not created for the purpose of aiding the prosecution and is not testimonial under Crawford and its progeny. Dr. Sanford made it abundantly clear that the abuse record was used in the treatment of B.A. Therefore, under our plain-error review, we find no error occurred at trial.
¶ 46. However, even if the admission of the abuse record was deemed error, Anthony must show the admission of the *622 report resulted in a manifest miscarriage of justice.
¶ 47. Anthony had adequate opportunity to cross-examine Dr. Sanford, and to the extent the admission of the social findings or the note portion of the abuse report was error, we find it was harmless. See, e.g., Gossett v. State, 660 So.2d 1285, 1296 (Miss.1995). The Mississippi Supreme Court has established a violation of a defendant’s right to confront witnesses may be deemed harmless error. Smith, 986 So.2d at 302(¶ 37); see also Bynum v. State, 929 So.2d 312, 314 — 15(¶ 6) (Miss.2006) (finding the trial court’s error in admitting the co-defendant’s statement was harmless); Clark v. State, 891 So.2d 136, 142(¶ 30) (Miss.2004) (finding admission of statements made by a non-testifying accomplice in violation of the Confrontation Clause was harmless error). In Gossett, the supreme court found that while the admission of an autopsy report implicated the defendant’s right of confrontation, the error was harmless because of the abundance of evidence that the defendant murdered the victim. Gossett, 660 So.2d at 1296-97.
¶ 48. In the present case, the State produced substantial additional evidence of felony child abuse. Specifically, Dr. Sanford offered his expert opinion that B.A.’s burns were intentionally inflicted. Dr. Sanford properly relied on the abuse record in forming his opinion that B.A.’s burns were intentionally inflicted by Anthony, which he was authorized to do under Mississippi Rule of Evidence 703. Since the social findings contained in the actual abuse report were merely cumulative, their admission was at most harmless error. See, e.g., Jones v. State, 606 So.2d 1051, 1057 (Miss.1992). While Anthony did not testify at trial, multiple conflicting statements by Anthony about how the infant was injured were admitted into evidence and presented to the jury without objection. The inconsistencies in Anthony’s recitations and, in particular, her account to Amosike of Marshall County DHS that her two-year-old was also in the tub at the time her infant was burned, directly conflict with the lack of any evidence whatsoever of burns on her two-year-okl’s body. Even if we were to find admission of the abuse record was error, we cannot say it resulted in a manifest miscarriage of justice. Accordingly, we find no reversible error here.

C. Mississippi Rules of Evidence 702 and 70S

¶ 49. Finally, Anthony contends that the admission of the abuse report exceeded the scope of Rules 702 and 703. However, Anthony failed to object to the admission of the record on these grounds at trial, and “[a] trial judge cannot be put in error on a matter not presented to him for his decision.” Logan v. State, 773 So.2d 338, 346(¶ 29) (Miss.2000) (citation omitted). “A specific and contemporaneous objection to the admission of the hearsay [evidence] must be made ... in order for [its] admissibility to be considered on appeal.” Bailey v. State, 960 So.2d 583, 588(¶ 19) (Miss.Ct.App.2007) (citation omitted). Here, Anthony did not make a specific objection at trial based upon Rule 702 or 703. Thus, Anthony’s argument on this issue is procedurally barred.
II. Sufficiency of the Evidence
¶ 50. In reviewing challenges to the sufficiency of the evidence, “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is *623 insufficient to support a conviction.’ ” Wright v. State 9 So.3d 447, 452(¶18) (Miss.Ct.App.2009) (quoting Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005)). We are not required to determine whether we believe “ ‘the evidence at the trial established guilt beyond a reasonable doubt.’ Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (quoting Bush, 895 So.2d at 843(¶ 16)).
¶ 51. Anthony was charged with felony child abuse, under Mississippi Code Annotated section 97-5-39(2)(a) (Rev.2006), which provides:
Any person who shall intentionally (i) burn any child, (ii) torture any child or, (iii) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse of a child and, upon conviction, shall be sentenced to imprisonment in the custody of the Department of Corrections for life or such lesser term of imprisonment as the court may determine, but not less than ten (10) years.
To sustain a conviction against Anthony for felonious child abuse, the State was required to prove: (1) Anthony intentionally burned B.A., and (2) her actions caused serious bodily injury to the child. Id.
¶ 52. Anthony argues because the case was circumstantial, the State was required to prove her guilt not only beyond a reasonable doubt, but also to the exclusion of every reasonable hypothesis consistent with innocence.
¶ 53. In addressing this argument, we first note that “all the proof need not be direct and the jury may draw any reasonable inferences from all the evidence in the case.” Wright, 9 So.3d at 453(¶ 20) (quoting Campbell v. State, 278 So.2d 420, 423 (Miss.1973)). In addition, intent may be proven by circumstantial evidence. Id. (citing Stinson v. State, 375 So.2d 235, 236 (Miss.1979)). Circumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence, and, in fact, “[a] conviction may be had on circumstantial evidence alone.” Tolbert v. State, 407 So.2d 815, 820 (Miss.1981) (citation omitted). Such “[circumstantial evidence need not exclude every possible doubt, but only every other reasonable hypothesis of innocence.” Shelby v. State, 812 So.2d 1144, 1146(¶ 5) (Miss.Ct.App.2002) (citation omitted). However, “[a]s is true in cases based on direct testimonial evidence, any conflicts created by the circumstantial evidence presented [are] for the jury to resolve.” Goff v. State, 14 So.3d 625, 650(¶ 97) (Miss.2009). Furthermore, as always, “[t]he jury weighs the credibility of each witness when considering conflicting testimony.” Shelby, 812 So.2d at 1146(¶ 6) (citation omitted).
¶ 54. Anthony’s claims of how B.A. was burned are not consistent "with the medical evidence or her own statements given to authorities and medical personnel. She provides two allegedly reasonable hypotheses that she claims are consistent with the circumstantial evidence offered. First, Anthony claims B.A. could have been injured when his two-year-old brother turned the hot water on him and then stepped on B.A.’s back to exit the tub. Second, Anthony claims J.A. could have exited the tub, and once out, pushed B.A. down into the tub in a playful manner.
¶ 55. But the medical evidence and Anthony’s accounts of the events contradict both of these theories. Dr. Sanford testified BA.’s burns were a result of forced *624 immersion/submersion, not from having hot water poured on him from a faucet. Furthermore, Dr. Sanford testified if hot water had been turned on while B.A. was in the tub, B.A.’s burns would not be of consistent depth, but would have a “rainbow pattern” or “layering” effect due to the varying temperature of water in the tub. Additionally, the jury was presented with pictures of the severity and pattern of the burns. As explained by Dr. Sanford, the burn pattern was symmetrical, mirror-image burns with minimal splash marks and a clear line of demarcation. The scenarios offered by Anthony do not explain this medical evidence. And certainly mere “playful pushing” could not have restrained B.A. enough to be consistent with the physical evidence.
¶ 56. This case is also similar to Foster v. State, 794 So.2d 301, 303(¶ 7) (Miss.Ct.App.2001). In Foster, this Court found there was substantial evidence to support the jury’s verdict in a child-burn case where the mother’s explanation that the child was immersed in hot water was inconsistent with the medical testimony. Id. Likewise, in the present case, Anthony’s claims of the cause of B.A.’s burns are inconsistent with medical evidence. Thus, considering the evidence in light most favorable to the State, there is sufficient evidence from which the jury could have reasonably inferred that Anthony intentionally held B.A. down in scalding water.
III. Weight of the Evidence
¶ 57. The standard for reviewing a trial court’s denial of a motion for a new trial is well settled. The appellate court sits as a “thirteenth juror” and views the evidence in the light most favorable to the verdict, and will only reverse the trial court’s decision when the verdict “is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844(¶ 18) (citation omitted). The proper remedy when the verdict is against the overwhelming weight of the evidence is to grant a new trial, but this power “should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.” Id.
¶ 58. We find there was substantial credible evidence showing Anthony intentionally burned her son by holding him down in the tub of scalding water. The jury heard expert opinion testimony that Anthony’s infant son was intentionally burned. They were also presented with physical evidence, as well as Anthony’s various different reports of how the infant was injured. Anthony’s accounts were contradicted by expert opinion testimony and the physical evidence. Viewing the evidence in the light most favorable to the verdict, we cannot say that allowing the verdict to stand would result in an unconscionable injustice. Accordingly, this issue is without merit.
¶ 59. For the foregoing reasons, we affirm Anthony’s conviction of felony child abuse and sentence of twenty years’ imprisonment.
¶ 60. THE JUDGMENT OF THE CIRCUIT COURT OF MARSHALL COUNTY OF CONVICTION OF FELONY CHILD ABUSE AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MARSHALL COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. GRIFFIS, J„ CONCURS IN RESULT ONLY.

. Due to the sensitive nature of this case, we substitute initials for the names of minor children to protect the children’s identities.

. According to Dr. Sanford, Texas law requires abuse reports to be created by healthcare providers in instances where suspicious injuries are discovered.

. We note that Anthony's statements themselves are admissions by a party-opponent and do not qualify as hearsay. See M.R.E. 801(d)(2). Thus, we are only concerned with statements of B.A.’s treating psychologists recounting Anthony’s admissions and any other statements in the abuse record that were made by the treating psychologists.