# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00886-COA

**MARCUS GARDNER**                                          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/25/2021 |
| TRIAL JUDGE: | HON. LEE SORRELS COLEMAN |
| COURT FROM WHICH APPEALED: | NOXUBEE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CYNTHIA ANN STEWART |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY B. FARMER |
| DISTRICT ATTORNEY: | SCOTT COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/08/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND McDONALD, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     This appeal stems from Marcus Gardner's convictions for first-degree murder and attempted murder in the Noxubee County Circuit Court, which resulted in his sentence to life imprisonment for first-degree murder and to serve twenty years for attempted murder set to run consecutively in the custody of the Mississippi Department of Corrections.  Gardner appeals his convictions based on the trial court's failure to strike a juror for cause, failure to exclude the testimony of the child victim, allegedly erroneous limitation of his cross-examination of a witness, and failure to refuse the State's allegedly improper jury instruction.  Finding no reversible error, we affirm Gardner's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2.     Years ago, Gardner was living at his mother's blue house in a small rural area known as Cockrell Quarters located in Brooksville, Mississippi.  In this neighborhood, practically everyone on Cockrell Quarters Road had familial ties.  The neighborhood's size was so small that the county coroner was moonlighting as a police officer, and if trouble was afoot, some residents would even fire a gun in the air to alarm others.

¶3.     On August 1, 2017, trouble came knocking at Andrew Perry's door.  The distance between Gardner's house and Andrew's house was about fifty yards.  Thus, a person standing inside Andrew's home could, perhaps, be able to hear the comings and goings of anyone shuffling about near Gardner's home.  Yet no one testified to be able to hear, see, or account for Gardner's movements on the day of the crimes until he appeared at Andrew's house around 3:00 in the morning.

¶4.     Andrew's daughter LaChristian ("Shantae") was the one who opened the door for Gardner.  She immediately saw that Gardner did not have a shirt and that he held a handgun in his right pants pocket.  Shantae knew that Gardner was not living by himself at the time.  His wife Chelsea Pace and her four-year-old child Jayceon Yarbrough ("Jay") lived with him.  Gardner told Shantae that someone had tried to rob him.  Shantae called for her mother, Linda Perry, who came to the front door and let Gardner inside.  Then, Shantae immediately left to go and retrieve her rifle to shoot in the air as an alert.

¶5.     Linda and Gardner are cousins, and he told her that someone tried to break into his house.  Linda asked about Pace and Jay.  Gardner told Linda that they were asleep.  This prompted Linda to wake up Andrew.  When Andrew came into the living room to see what

2

all the commotion was about, Gardner repeated that someone had broken into his house. Andrew went with Gardner to scope out Gardner's house. Before going, Gardner asked Andrew if he had any spare bullets for a .380-caliber firearm in his home. Andrew told Gardner he did not possess any .380-caliber bullets.

¶6. Andrew and Gardner searched the outside perimeter of the home and looked through windows to see if an intruder remained inside. Andrew saw no sign of breaking and entering. Andrew then crept inside the house, going through the front door. To his dismay, he saw a trail of blood in the hallway.

¶7. Andrew then stepped into Gardner's bedroom and saw that Pace was lying on her back with blood all over the floor. Andrew proceeded to check Jay's bedroom. He noticed that Jay was lying on the bed and that he felt "cold as ice." Andrew asked Gardner, "What have you done?" Gardner said, "Man, somebody broke in my house." Andrew began easing out of the bedroom. Gardner said, "You ain't gonna tell nobody, is you?" Andrew, observing that Gardner had what he believed to be a pistol in his pocket, responded, "Hell, no. We [have] [to] clean this up, you know."

¶8. Andrew returned to his house, with Gardner following. Linda and Shantae were awake in the kitchen. Gardner asked Andrew and Linda for a shirt and a pair of shoes. Gardner found a bottle of Clorox, opened it, and began washing his arms. Quickly, Andrew pulled Linda to the side and relayed everything he had seen. Andrew also alerted Deputy Terry Grassaree and then-Chief Deputy Eddie Franklin of the Noxubee County Sheriff's Department, by text message, that there had been two murders. Chief Deputy Franklin later

3

confirmed he received Andrew's text messages.

¶9.    Simultaneously, Shantae engaged in conversation with Gardner.  Shantae asked Gardner where Jay was in the midst of all this.  Specifically, Shantae said, "I'm surprised [Jay] ain't run out the house."  Gardner told her, "[A]in't no more running," and then began to laugh.  Shantae said Gardner believed that Pace had "set him up."  Gardner also told her that it was going to be a "hot, rainy summer."  Shantae explained that she knew that "hot, rainy summer" referred to "death" because when people die in their area, everyone says that the rain "wash[es] away the footsteps."

¶10.   At that moment, Gardner received a phone call and walked over to the living room where Shantae's sister Jerilyn ("Sharee") was.  After he hung up the phone, he told Sharee that he was going to go to see his grandmother Stella Hopkins, who lived down the street.

¶11.   Five minutes later, Shantae heard a gunshot.  Linda barricaded the front door, and Andrew went shuffling for bullets.  He found two inside his son-in-law's gun.  Linda and Andrew had every intention to shoot Gardner should he return.  They pushed their daughters to go to Deputy Grassaree's house.

¶12.   At approximately 5:00 in the morning, Shantae and Sharee left in Shantae's Tahoe and ran across Gardner's aunt Katina Hopkins at Tenn-Tom, the town gas station. Shantae told Katina, "I think [Gardner] done killed them people over there."  Shantae's conversation with Katina then triggered another set of events.

¶13.   Instead of going to Deputy Grassaree's house, Shantae followed Katina back to Cockrell Quarters.  Shantae saw Katina go to Stella's house to tell her mother and everyone

4

else in the house what had been told to her. Everyone came out of Stella's house and began walking up to Gardner's house. Linda said that her second cousin Kanesha asked for her to come outside because there was some smoke in Gardner's backyard. Linda also said that when she stepped outside, she saw fire go up "about the length of a body" at the back of Gardner's house.

¶14.    Kanesha, Linda, Shantae, Sharee, and Kennedy Hopkins (Gardner's uncle) went inside Gardner's house. Shantae said that when they walked in, everyone saw a trail of blood coming from Pace's bedroom. None of them found Pace's body. They then went to Jay's room. There, they found Jay lying in a ball with "holes" in his body. Each of them believed Jay was dead—that is, until Jay lifted his hand in the air.

¶15.    The family focused on getting Jay to the hospital. Shantae grabbed Jay and began applying pressure to his bullet holes. Someone grabbed a dry towel to wrap around him and then Shantae carried him outside. Kennedy, Sharee, and Shantae hopped into Shantae's Tahoe to take Jay to the Baptist Memorial Hospital in Columbus. Kanesha called 911 and requested an ambulance to meet Shantae en route because a boy had been shot, and his mother was presumed dead. After placing Jay in the ambulance, Shantae followed behind the ambulance and then stayed with Jay until he entered the emergency room.

¶16.    Jay was later transported by helicopter to the University of Mississippi Medical Center (UMMC). Although Jay was stable at the time, his assigned medical professional Melissa Frascogna said that he was in critical condition. Dr. Frascogna observed that Jay, weighing under thirty-six pounds, had been shot five times: three times in the chest, once in his left

5

shoulder, and once in his left thigh. Dr. Frascogna treated Jay for his injuries. Later, Dr. Frascogna concluded that if Jay had not come to the hospital, then he would have died.

¶17. On a second phone call with a 911 dispatcher, Kanesha told the dispatcher that there was a "blaze" behind Gardner's house. Dispatcher Naketta Bland's incident report summarized the information she received from the phone call: (1) Pace's body was no longer inside the house, (2) a minor child had been shot, (3) others were on their way to the hospital, (4) and Kanesha believed Pace had been dragged out the door and that her body was on fire. In response, Dispatcher Bland alerted the Brooksville Fire Department. Within fifteen minutes, the firefighters were at Gardner's house. They were the first to arrive. The two firefighters extinguished the fire without complication.

¶18. Deputy Dontavious Smith arrived next. As the night patrolman, his job was to clear the residence. He walked through each room and ensured that no living person or thing remained in the house with the potential to contaminate the crime scene. And he followed the trail of blood leading out the back door. At first glance, he did not see Pace's body. The deputy initially thought Pace's body was a burned doll. According to Smith, this may have been because the grass in the backyard had not been cut, appeared to be a woody area, and was filled with weeds and branches. But eventually Deputy Smith found Pace in some brush behind the residence. He also found a burned comforter and purse inside the brush, too, which prompted him to call the sheriff's office.

¶19. Police Officer and Chief Coroner R.L. Calhoun came to investigate Pace's death and to perform a postmortem examination of Pace. Calhoun assessed that Pace was female

6

because her breasts were visible, as the only piece of clothing covering her body was a pair of underwear. He also determined that Pace had a wound to the head, burn marks on her face, knees, and legs, and skin that was falling off.

¶20. Deputy John Clanton initially arrived at the crime scene to bring water to the other deputies, but once he was there, Calhoun asked him to go and retrieve the funeral home's van for Pace's transport. When Deputy Clanton returned, he and Calhoun placed Pace in a black bag and put her on a stretcher to briefly hold her and then transport her to the State Medical Examiner's Officer for an autopsy. The autopsy confirmed that Pace had died from multiple gunshot wounds, although she also had third-degree burns all over her body.

¶21. Deputy Clanton returned to the Cockrell Quarters looking for Gardner, who was the main suspect. A family member informed Deputy Clanton that Gardner was at his grandmother's house. Deputy Clanton went to the house and saw Gardner standing in the doorway and arrested him without incident. At the time, Gardner was searched for weapons, and none were found on his person. Gardner professed "he didn't do it."

¶22. The police officers transported Gardner to the Noxubee County Jail. As a part of the criminal investigation, Gardner was drug tested. His drug test results were negative. In addition, Gardner's DNA was swabbed, transported to Scales Biological Laboratory, and then compared to the DNA found on Pace's body. The DNA analysis showed that Gardner was a possible match.

¶23. During the investigation, Criminal Investigator Maurice Johnson canvassed the crime scene. Investigator Johnson videotaped the scene and documented the evidence. While at

7

Gardner's house, Investigator Johnson noticed that there was no evidence of forced entry. Outside the house, he found a drawer near the location of where the coroner retrieved Pace's body. Investigator Johnson also saw what "looked like a small burn pile" where the brush was located. Inside Pace's bedroom, Investigator Johnson saw that there was blood on the floor and the mattress, Xanax on the dresser, and a missing drawer from the dresser. He also found a Taurus gun box suited for a .380-caliber automatic firearm, along with shell casings and projectiles. However, he did not connect the gun box, shell casings, or projectiles to Pace's murder.

¶24.    Investigator Johnson was also present at the forensic interview held between Jay and Raven Ponds at a family-services organization called Sally Kate Winters. During the forensic interview, Jay reportedly stated that "the shooting happened at night but it was the next day when all those people came in the house." Jay further stated that "Daddy Marcus shot my momma and she is already dead and Daddy Marcus shot me while I was sleeping." Jay identified Gardner as having "dreads." And when Jay was asked if he saw Pace get shot, he said, "Yes and I proved it because I saw her bleeding and she couldn't talk."

¶25.    After the evidence was gathered, the grand jury indicted Marcus Gardner for the attempted murder of Jay and the first-degree murder of Pace in March 2018. On March 26, 2018, Gardner waived his right to an arraignment and entered a plea of not guilty. His trial was set for September 23, 2019. Due to the multitude of continuance orders entered because the State and the defense needed additional time to prepare for trial, Gardner's trial did not begin until March 22, 2021. On March 22, 2021, the trial court declared a mistrial because

the first trial began but did not have enough potential jurors. The trial court reset the trial to June 21, 2021.

¶26. On June 21, 2021, the trial proceedings began with a voir dire that involved the trial judge and counsel asking the prospective jurors questions about the degree of their relationship to Gardner and any of the other parties in the case. After all questions were asked, the court recessed for thirty minutes.

¶27. When the attorneys returned, the State presented its challenges for cause. The trial court granted the for-cause challenges. The defense raised one cause challenge, stating that the State "took all the rest." Next, the parties began submitting each of their twelve peremptory strikes. The State submitted Juror 30, Johnny Birchfield, as a juror. The defense stated "30 and 32 are fine." The trial court asked, "You accept 30 and 32; is that correct?" The defense replied, "Correct." At that time the defense had four peremptory strikes left. Within moments, the defense used the rest of their peremptory strikes.

¶28. A jury of twelve was selected, with Johnny Birchfield being accepted as the eighth juror. The State submitted two jurors as alternates. Before the defense accepted the alternates, the defense said, "Your Honor, we do have an issue that's come up. Mr. Gardner said that when he was in jail, juror number 30, Mr. Birchfield, was a minister who came and spoke with him at the jail and some of those conversations were about this case." The trial court commenced with a separate voir dire of Birchfield.

**A.   Juror Birchfield**

¶29. The examination of Birchfield revealed that he was a minister at the Noxubee County

9

jail and worked for the Macon Police Department, but he did not have conversations with Gardner about the case. Birchfield explained that he did not have one-on-one sessions with Gardner or discuss his charges with him. Instead, his church services were once every Sunday in a group setting.

¶30. The defense questioned Birchfield about his failure to raise his hand during jury selection when asked whether he knew Gardner. Birchfield said that he did not know if his services qualified as "knowing" Gardner. He also said that he had asked one of the bailiffs, "[D]id that correlate." Birchfield said, "I knew him, but I didn't, like, have a relationship with him or anything."

¶31. The State questioned Birchfield about his ability to remain impartial. The State's concern was whether Birchfield could pass judgment on Gardner because of his religious background. Birchfield stated that it would not be an issue. The State also asked if Birchfield carried any sympathies toward Gardner. Birchfield said, "No." The State asked Birchfield if he would be able to hear the evidence and make a determination solely based on the evidence and the law. Birchfield replied, "Absolutely."

¶32. The trial judge then heard arguments. The defense requested that the trial court strike Birchfield for cause because of his failure to disclose material information and because he was employed with law enforcement. The State alleged that the defense conveniently challenged Birchfield for cause after all their peremptory strikes had been used, as Gardner also knew that Birchfield was a minister at the jail. The defense did not refute this statement. The State argued that Birchfield demonstrated an ability to be fair and impartial.

10

¶33. The defense requested that Birchfield be substituted for one of the alternates. The State pointed out that if the court were to substitute Birchfield, then it would be, in effect, giving the defense thirteen peremptory strikes. After review, the trial court denied the for-cause challenge and allowed Birchfield to sit on the jury.

**B.    Tender-Years Hearing**

¶34. On the second day of trial, the trial court held a hearing to assess Jay's competency as a child to testify. Jay was asked extensively about his understanding of the difference between the truth and a lie and the meaning of a promise. Jay was also questioned in regard to his memory. He stated that he remembered the night in question because that was the night his mom died. He also remembered what Gardner looked like: "[H]e had long dreads. He was sort of tall and he wasn't really fat, but he wasn't really skinny."

¶35. On cross-examination, however, the defense revealed the facts that Jay did not remember. The defense asked Jay if he remembered telling the forensic interviewer certain things such as: that his friends were shot, he was sleeping when he was shot, and he saw his mother get shot. Jay said he did not remember. He also did not remember taking the forensic interview. Moreover, when asked if his grandmother had ever corrected him about the events that occurred that night, he said, "I don't think so."

¶36. The trial court found that even if some of his statements were inconsistent, Jay was competent to testify because he demonstrated an ability to understand questions and remember events, and he testified better that many adults. Afterward, the trial court moved forward with the trial.

11

## C. Presentation of Evidence

¶37. Witnesses Andrew, Linda, Shantae, Kanesha, and Jay testified against Gardner on behalf of the State. Andrew testified first and identified Gardner as being present at the scene on the night in question. Andrew testified to seeing both Pace and Jay lying wounded on the floor in both of their bedrooms. Andrew also testified to having a conversation with Gardner about Pace and Jay in which Gardner questioned whether Andrew was going to tell anybody. At the very beginning of Andrew's cross-examination, the defense asked Andrew, "How many times have you been convicted of a felony?" The State objected to the questioning. Outside the presence of the jury, the trial judge heard arguments.

¶38. The State argued that pursuant to Mississippi Rule of Evidence 609(b)'s time limitations, Gardner was prohibited from cross-examining Andrew on any of his prior convictions because those convictions occurred more than ten years prior to the commencement of the trial. Defense counsel responded that he did not know if Andrew's prior convictions were more than ten years old; he was asking the question because he knew that Andrew had a pending felony. The court recessed for the State to present proof that Andrew had been released more than ten years ago. The trial court determined that once the question was answered as to whether ten years had passed, the court would hold a hearing on the impeachment value of the evidence.

¶39. Upon return, the State presented proof that Andrew had been convicted of burglary in 1999, larceny of a dwelling in 2000, and receiving stolen property in 2006. Further, Andrew had been released from incarceration in August 2010. Therefore, the trial court

12

concluded that more than ten years had passed since Andrew's release.

¶40.    The defense responded that the prior convictions were probative because they were "crimes of dishonesty." The trial court ruled that there had been a lack of written notice, as required under Rule 609(b)(2), and that even if notice were waived, defense counsel failed to prove that admission of the prior convictions would be more probative than prejudicial.

¶41.    Next, the defense argued that Andrew's pending felony was relevant to the question of Andrew's credibility. The defense asserted that if Andrew had been offered "anything in exchange for his testimony," then questioning him on his pending felony was relevant. The trial court agreed: "[I]f there has been any kind of agreement, he could - - you could ask him that, if [Andrew] has a pending charge."

¶42.    Later, when revisiting the question of the pending charge, the trial judge asked for specifics as to what the charge was. The prosecution said Andrew had been indicted for possession of a weapon by a felon in 2016. The trial judge did not "see the relevance of [the charge] unless he ha[d] been promised something."

¶43.    The defense argued that Andrew had received the benefit of a continued trial for his pending charge and of being released on bond because he was a witness in the current trial. The defense also noted that Andrew was a habitual offender. Therefore, Andrew had received the benefit of not having a sentencing and that Andrew expected to receive an additional benefit in exchange for testifying. The trial court ruled that the defense could cross-examine Andrew on his pending felony charge and as to whether Andrew had any expectations of leniency.

13

¶44. Jay was the last to testify. Jay testified that he was at Gardner's house on the night his mother died and he got shot. No one else was at the house except him, his mother, and Gardner. In the middle of the night, Jay woke up and went inside his mother's room. He saw a broken table and a lot of blood. He testified that when he shook his mother, she did not move. Because he did not understand at the time that she was dead, he returned to his room and went to sleep.

¶45. When he woke up the second time, he was thirsty and wanted some chocolate milk. Before he could leave the room, however, he saw flashes at the door. He testified that "the next thing [he] knew, [he] was on the ground. He further testified that he knew for sure that Gardner had been the one to shoot him. When asked how he knew that Gardner was the shooter, he said the shooter had "the same body height, same body figure and he had the same dreads as [Gardner] had at the time."

¶46. On cross-examination, Jay testified that he did not see Gardner the first time he went to check on his mother. He also said that he was shot while standing up. Similar to his testimony at the competency hearing, Jay did not recall telling anyone that he was asleep when he got shot. Jay also said he did not remember having a forensic interview.

¶47. The defense played a video recording of the forensic interview. After watching the recording, the defense asked Jay if he heard himself say a few statements. On the video recording, the interviewer asked Jay who shot him. The defense asked if Jay heard himself say, "[M]y daddy when I was asleep." Jay stated, "Yes." The defense also asked Jay if he now recalled saying to the interviewer that he "had friends in the house" that "got shot too."

Jay said, "Yes." Jay also agreed that in the interview he said that his friends "ran away." On redirect, the State asked Jay, "Who shot you five times?" Jay responded, "Marcus."

¶48. The State rested its case. The defense rested and did not call any witnesses.

### D. Jury Instructions

¶49. The trial judge discussed the proposed jury instructions with the prosecutor and defense counsel. The State proposed three jury instructions. The State's first jury instruction ("S1") instructed the jury:

> If you find beyond a reasonable doubt from the evidence in this case that on or about August 1st, 2017, in Noxubee County, Marcus Gardner unlawfully and with deliberate design killed Chelsea Pace, a human being, without authority of law and not in necessary self-defense, then you shall find Marcus Gardner guilty of first degree murder.

¶50. The second jury instruction ("S2") defined deliberate design:

> Court instructs the jury that the instruction "deliberate design" means a person decides to unlawfully kill another. There is no legally justifiable excuse for doing so. The decision to kill a person may be formed very quickly and may occur only moments before the actual act of killing; however deliberate design cannot be formed at the exact moment of the killing.

¶51. The third jury instruction ("S3"), after amendment, read:

> If you find beyond a reasonable doubt from the evidence in this case that on or about August 1st, 2017, in Noxubee County, Mississippi, Marcus Gardner unlawfully designed to commit murder by shooting [Jay], an overt act towards committing murder, but Marcus Gardner did not actually complete the murder or was prevented from completing the murder because [Jay] survived the gunshot wounds, then you shall find Marcus Gardner guilty as charged of attempted murder in count two. If the State did not prove any of the above-listed elements beyond a reasonable doubt, then you shall find Marcus Gardner not guilty of count two.

The State's jury instructions were admitted without objection. The jury returned from

deliberations and found Gardner guilty of the first-degree murder of Pace and the attempted murder of Jay. Gardner appeals his convictions arguing that (1) the trial court failed to strike Birchfield for cause, thus violating his right to a fair and impartial jury, (2) the trial court erred by finding Jay competent to testify, (3) the trial court erroneously limited the cross-examination of Andrew Perry, and (4) the trial court erred by admitting the State's jury instruction S3, which resulted in an unfair trial and violated his constitutional rights.

**STANDARD OF REVIEW**

¶52.    The selection of jurors is a "judgment call peculiarly within the province of the circuit judge, and one we will not on appeal second guess in the absence of a record showing a clear abuse of discretion." *Adkins v. Sanders*, 871 So. 2d 732, 740 (¶31) (Miss. 2004) (quoting *Brown ex rel. Webb v. Blackwood*, 697 So. 2d 763, 771 (Miss. 1997)); *Johnson v. State*, 224 So. 3d 549, 551 (¶5) (Miss. Ct. App. 2017); *Williams v. State*, 61 So. 3d 981, 984 (¶14) (Miss. Ct. App. 2011). An appellate court will only reverse the trial court when the court "clearly is of the opinion that a juror was not competent." *Id.* (quoting *Fleming v. State*, 732 So. 2d 172, 181 (¶27) (Miss. 1999)).

¶53.    We review a trial court's determination that a child was competent under the abuse-of-discretion standard. *See Barnes v. State*, 906 So. 2d 16, 20 (¶17) (Miss. Ct. App. 2004). "This Court will affirm the trial court's ruling unless it can safely say that the trial court abused its discretion in allowing or disallowing evidence to the prejudice of the accused." *Tubbs v. State*, 185 So. 3d 363, 367 (¶9) (Miss. 2016).

¶54.    A trial court's decision to limit cross-examination of a witness is reviewed for abuse

16

of discretion. *Anthony v. State*, 108 So. 3d 394, 397 (¶5) (Miss. 2013). "We will affirm the trial court's exercise of discretion unless the ruling resulted in prejudice to the accused." *Id*. In other words, even if the appellate court concludes that the trial court erred by limiting the cross-examination of a witness, we may still affirm the conviction if the error was harmless. *Collier v. State*, 183 So. 3d 885, 892 (¶28) (Miss. 2016). Because a case "must result in prejudice and harm or adversely affect a substantial right of a party" in order for it to be reversed. *Jackson v. State*, 245 So. 3d 433, 439 (¶39) (Miss. 2018). "[Therefore], determining whether the trial court abused its discretion in limiting cross-examination necessitates careful reflection upon the nature and purpose of the question propounded." *Jackson*, 245 So. 3d at 440 (¶37).

¶55. "Jury instructions are within the discretion of the trial court and the settled standard of review is abuse of discretion." *Watkins v. State*, 101 So. 3d 628, 633 (¶16) (Miss. 2012). "Jury instructions are to be read together and taken as a whole with no one instruction taken out of context." *Harris v. State*, 861 So. 2d 1003, 1012-13 (¶18) (Miss. 2003). "[T]he court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id*.

## DISCUSSION

### I. Failure to Strike Johnny Birchfield for Cause

¶56. Gardner argues that the trial court erred when it failed to remove Birchfield from the jury for his failure to disclose his relationship with Gardner, which thus deprived him of his right to exercise his peremptory strike and to have an impartial jury. A denial or grant of a

17

challenge for cause is within the discretion of the court, as "a judge is empowered with broad discretion to determine whether a prospective juror can be impartial." *McNeal v. State*, 617 So. 2d 999, 1003 (Miss. 1993); *accord Langston v. State*, 791 So. 2d 273, 281 (¶17) (Miss. Ct. App. 2001) ("A juror removed on a causal challenge is one against whom a cause for challenge exists such that the juror's impartiality at trial is likely affected.").

¶57. At the beginning of jury selection, the trial judge asked, "Is there anything about your acquaintance with any of the parties herein . . . whether it arises from . . . business association, fraternal affiliation, church membership or otherwise that would [a]ffect any of you in being anything other than a fair and impartial juror in this case?" Birchfield did not raise his hand. Sometime after the State then asked the jury, "Is there anybody in this courtroom that knows Mr. Gardner from Noxubee County or knows him from anywhere? Raise your hand." Once again, Birchfield did not raise his hand.

¶58. After the examination, the State and the defense gave challenges for cause and used all their peremptory strikes. The trial judge read aloud the jury list, with Birchfield being listed as the eighth juror, and then asked if both the State and defense agreed on the jury panel. Both agreed. Moments after, but before the jury had been seated, the defense alerted the trial court that "Mr. Gardner said that when he was in jail, juror number 30, Mr. Birchfield, was a minister who came and spoke with him at the jail." The defense moved for the trial court to strike Birchfield for cause and substitute him with an alternate. The trial court held a separate voir dire of Birchfield for the parties to fully examine what information Birchfield withheld and whether he could remain fair and impartial:

18

**DIRECT EXAMINATION BY THE DEFENSE**:

DEFENSE: Mr. Birchfield, did you have occasion to serve as the minister at the Noxubee County Adult Detention Center, the jail?

JUROR: Yes.

DEFENSE: Okay. And did you have occasion to meet with Mr. Marcus Gardner while he was incarcerated there?

JUROR: I got a chance to meet him. Yes, sir.

DEFENSE: Okay. And were you aware that he was in there as a result of these charges that he's here today for?

JUROR: No, sir, I didn't.

DEFENSE: But you did minister to him while he was there?

JUROR: Yes, sir.

DEFENSE: And did y'all have conversations regarding the facts of this case?

JUROR: No. Sir, we didn't.

DEFENSE: Okay. And, you know, when the question was asked of whether you were related or knew Marcus Gardner, did you respond to that question?

JUROR: I asked one of the bailiffs, but I didn't know if that was actually - - did that correlate. I knew him, but I didn't, like, have a relationship with him or anything.

DEFENSE: Okay. But you did minister to him at the jail?

JUROR: Yes, sir.

DEFENSE: I tender the witness, Your Honor.

COURT: All right. Any cross-examination?

19

DEFENSE:    Yes, sir.

**CROSS EXAMINATION BY THE STATE**:

STATE:    Mr. Birchfield, how often did you minister to Mr. Gardner as far as you can recall? Was it one time or more than one time?

JUROR:    It was every Sunday.

STATE:    Okay. And when you say "minister to him", what do you mean by that?

JUROR:    We had church service.

STATE:    Okay.  So was this a group setting?

JUROR:    Him and some of the other guys were there, just had a regular church service.

STATE:    So was it a one - -  it wasn't a one-on-one interactions with Mr. Gardner.

JUROR:    No.  No, ma'am.

STATE:    And when you're ministering and, I guess, having this service, there's not anything specific to what's going on in his life as far as his criminal charges being brought up.

JUROR:    No.

STATE:    Okay. And did -- now that this has been brought up that you did have this interaction through a church service with him, does it change any of your answers that you were asked earlier during voir dire?

JUROR:    No. It doesn't.

STATE:    Okay.

STATE:    Court's indulgence just one second.

STATE:    Mr. Birchfield, if you are picked to serve on this jury, the fact

20

that you ministered to Mr. Gardner, y'all worshipped together, he was part of a church service with you on more than one occasion, are you going to consider that at all when it comes time to deliberate on whether or not he's guilty or not guilty?

JUROR:     No, ma'am.

STATE:     You don't feel like you might have any feelings of sympathy towards him because you've, you know, served as a minister to him?

JUROR:     No, ma'am.

STATE:     Okay. In that capacity as a minister, did you have any contact with anybody related to him or anything like that?

JUROR:     No, ma'am.

STATE:     You don't know any of those family members?

JUROR:     I don't.  No, ma'am.

STATE:     With your background being involved with the ministry, do you have any issues with sitting in judgment of others?

JUROR:     I don't.

STATE:     So you would be able to hear what we can present to you as far as the proof that the State has and make a determination based solely on what our proof is and solely on what the Judge tells you the law is?

JUROR:     Absolutely.

STATE:     And just to be clear, I think [the defense] addressed this, y'all didn't talk about his charges at any point; is that correct?

JUROR:     No, ma'am.

STATE:     He made no statements to you about his legal issues that he had?

JUROR:     No ma'am.

STATE:      Certainly nothing specific; is that correct?

JUROR:      Nothing specific at all.

STATE:      Okay. That's all I have, Your Honor.

DEFENSE:    Redirect, Your Honor.

**REDIRECT EXAMINATION BY THE DEFENSE:**

DEFENSE:    What is your current employment?

JUROR:      Department of Corrections and Macon Police Department.

DEFENSE:    Macon Police Department?

JUROR:      Yes, sir.

DEFENSE:    So you're in close contact with the sheriff's department and the city police department as a result of that?

JUROR:      Yes, sir.

DEFENSE:    Okay. And when you were asked about relationship with the officers that were named . . . you didn't respond to any of those questions either, did you?

JUROR:      I raised my hand for Smith.

DEFENSE:    For Smith. Okay. And so, that's the -- so at this point, you're employed with law enforcement. You work closely with those gentlemen and - -  are you still doing ministry as well?

JUROR:      Yes, sir.

DEFENSE:    Okay.

DEFENSE:    I tender the witness, Your Honor.

COURT:      All right. You may be excused, Mr. Birchfield.

The trial court ruled that Birchfield could remain on the jury.

¶59.  Since Birchfield had already been accepted, per statute, the trial court could have only removed Birchfield if one of two circumstances existed.  "[A] juror may be excused after he has already been accepted." *Langston*, 791 So. 2d at 281 (¶17) (citing *McNeal*, 617 So. 2d at 1003).  The *McNeal* opinion highlighted two circumstances:

(1)     a juror is "unable" to perform his or her duties; or
(2)     a juror is "disqualified."

*McNeal*, 617 So. 2d at 1003 (citing Miss. Code Ann. § 13-5-67); *see Langston*, 791 So. 2d at 281 (¶18).

¶60.  In essence, Gardner contends that Birchfield should have been removed because he was unable to perform his duties and for disqualification.  Gardner argues that Birchfield was unable to perform his duties because of his relationship with the defendant.  *See Scott v. Ball*, 595 So. 2d 848, 850 (Miss. 1992) ("To the extent that any juror, because of his relationship to one of the parties, his occupation, his past experience, or whatever, would normally lean in favor of one of the parties, or be biased against the other . . . , to this extent, of course, his ability to be fair and impartial is impaired.").  He also argues that Birchfield should have been disqualified because he withheld information. *McNeal*, 617 So. 2d at 1003 ("[A] juror may be disqualified for withholding or misrepresenting information when a 'clearly worded' question was posed during voir dire.").

¶61.  Our law, as it relates to a juror's withholding of information, states that "[t]he failure of a juror to respond to a relevant, direct, and unambiguous question leaves the examining attorney uninformed and unable to ask any follow-up questions to elicit the necessary facts to intelligently reach a decision to exercise a peremptory challenge or to challenge a juror for

23

cause." *Odom v. State*, 355 So. 2d 1381, 1383 (Miss. 1978). When this failure occurs, "the trial court should, upon *motion for a new trial*, determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited." *Id*. (emphasis added). "If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond." *Id*.

¶62. We pause here to note that Gardner did not move for a mistrial and, later, did not file a motion for a new trial. In our prior decisions, the trial court was given an opportunity to apply the *Odom* test and then grant or deny the motion. Because Gardner did not file a motion for a new trial, we do not rely on *Odom* for the purpose of reviewing the trial court's application of the *Odom* test. *See generally Burroughs v. State*, 767 So. 2d 246, 253 (¶21) (Miss. Ct. App. 2000) (using "the objective facts established in the record of the post-trial hearing on the motion for [a] new trial . . ."); *Myles ex rel. Sparks v. Entergy Miss. Inc.*, 828 So. 2d 861, 866 (¶12) (Miss. Ct. App. 2002) ("To be granted a new trial based on juror concealment of material information, a defendant must show that the requirements set out in *Odom* are all satisfied."); *Vickers v. State*, 994 So. 2d 200, 220 (¶77) (Miss. Ct. App. 2008) (reasoning that the appellate court could presume that the trial court answered the *Odom* questions in the affirmative because the trial court denied the motion).

¶63. We rely on *Odom* only to the extent that its principles remain good law:

> It is readily evident that no firm, unbending rule can be laid down that would control every situation that might arise on the voir dire of prospective jurors.

> Therefore, each case must be decided on an ad hoc basis considering the facts then before the court.

*Odom*, 355 So. 2d at 1381. This principle of *Odom* has been affirmed. *Langston*, 791 So. 2d at 282 (¶19) ("As there is no firm rule guiding the courts in every given situation of voir dire examination, these matters must be determined on a case by case basis.").

¶64. We further distinguish this case because the parties were able to voir dire Birchfield on whether he knew Gardner before the trial began. Our supreme court has held that a juror's withholding of information causes harm by potentially preventing the implementation of a fair and impartial jury because the "voir dire examination is often the most crucial in forging our primary instrument of justice." *Myers v. State*, 565 So. 2d 554, 558 (Miss. 1990); *see Thomas v. State*, 818 So. 2d 335, 351 (¶56) (Miss. 2002). Thus, the parties rely on a juror's candor when making challenges for cause and peremptory challenges. *Thomas*, 818 So. 2d at 351 (¶56); *Myers*, 565 So. 2d at 558.

¶65. However, the facts of this case are unique because the defense alerted the trial court that a juror had withheld information after the peremptory challenges had been exhausted and after the juror was accepted but *before* opening statements. *Cf. Davis v. State*, 512 So. 2d 1291, 1292 (Miss. 1987) (reviewing the trial court's refusal to remove an accepted juror under heightened scrutiny). Afterward, the trial court properly held an individual voir dire of Birchfield and allowed the parties could further examine him. UCRCCC 3.05; *cf. Balfour v. State*, 598 So. 2d 731, 756 (Miss. 1992) ("[I]t was error for the trial judge to refuse defense counsel an opportunity to further examine potential jurors."). Thus, the injustice that occurs when a juror has withheld information is not present here (where a follow-up examination

25

occurred, and the defense was able to challenge for cause before opening statements).

¶66. To be fair, had Birchfield disclosed the information or raised his hand when the question was asked, the defense would have had an opportunity to exercise one of its peremptory strikes. At the time that Birchfield was accepted, the defense had four peremptory strikes left. The record reflects that the State argued that the defense had strategically waited until after it had exhausted its peremptory strikes before alerting the court that Birchfield knew Gardner and the defense did not refute this argument. However, the State also did provide any proof that the defense intentionally delayed alerting the trial court of Birchfield's alleged impartiality.

¶67. Setting aside Birchfield's failure to respond, it is the appellant's responsibility to show that "an incompetent juror [was] forced by the trial court's erroneous ruling to sit on the jury." *Burgess v. State*, 178 So. 3d 1266, 1276 (¶28) (Miss. 2015). Gardner has failed to show that the trial court's ruling was erroneous.

¶68. "Mere acquaintance or even family relationships with parties or those related to parties is not sufficient to require that a juror be excused for cause." *Bell v. State*, 725 So. 2d 836, 846 (Miss. 1998). The relationship is viewed on a case-by-case basis, and the challenging party must lay the grounds for the strike. Wayne R. LaFave et al., *Criminal Procedure* § 22.3(c) (4th ed.) (updated Nov. 2022). "Less personal connections, such as when a family member of the victim is a Facebook 'friend' of a juror, will not raise a presumption of bias." *Id*. Therefore, in order for the presumption to apply, the relationship must be one "close" in nature. *See id.*

26

¶69.   Further, we have upheld a trial court's ruling that a juror could remain on the jury when on motion for a new trial the juror testified that she knew the defendant. *Doss v. State*, 906 So. 2d 836, 840 (¶14) (Miss. Ct. App. 2004).  In *Doss*, the juror testified that "she did not know [the defendant], only that she knew of him from seeing him around the community." *Id*. at (¶15).  She further testified that she was aware her daughter and the defendant had dated but did not know for how long.  *Id*.  Additionally, the juror said that she did not have any problems with the defendant and was not aware that he had any problems with her daughter.  *Id*.  Further, the defendant testified that he knew the juror. *Id*. at (¶16).  Thus, we held that the trial court did not abuse its discretion.  *Id*. at (¶17).  By comparison, our supreme court has also held that a juror's casual knowing of a victim "from having seen him in the community" was not enough to find the trial court in error for failing to remove the juror.  *Archer v. State*, 986 So. 2d 951, 957 (¶24) (Miss. 2008).

¶70.   Here, the record supports the trial court's ruling.  The only contact Birchfield had with Gardner was when he ministered to a group of people at the jail where Gardner had been detained.  And there is no evidence or proof that Birchfield personally ministered to Gardner.  Birchfield denied having one-on-one interactions with Gardner and twice denied having any discussions with Gardner about his criminal charges or the case.  The mere fact that Birchfield knew of the defendant is not enough for us to find that the trial court clearly erred,[1] especially when the juror has promised that he or she will remain impartial. *Adkins*,

---

[1] "Exclusions for implied bias are appropriate when the prospective juror is related to the victim or a key prosecution witness through familial ties, or close friendship." LaFave, *supra* (¶68), § 22.3(c) (4th ed.).

871 So. 2d at 742 (¶40) (explaining that we give great deference to the juror's promise to remain impartial). We have affirmed a trial court's decision to allow a juror to remain when the juror stated that "notwithstanding his acquaintance with [the mother], he would be unbiased and would decide the case based solely on the law and evidence." *Wright v. State*, 9 So. 3d 447, 451 (¶14) (Miss. Ct. App. 2009). Here, Birchfield also said that he would be able to hear the evidence and make a determination based solely on the law and that he was not sympathetic toward Gardner.

¶71. Thus, given the lack of evidence in the record showing that Birchfield had a personal relationship with Gardner and Birchfield's indications that he would remain impartial, we conclude that Gardner has not shown that his right to an impartial jury was violated. Therefore, we affirm the trial court's ruling. *Id*. (citing *Archer*, 986 So. 2d at 958-59 (¶30)).

## II. Jay's Testimony

¶72. Gardner next argues that the trial court erred by finding Jay competent to testify because Jay's testimony had been "tainted" by his grandmother, and he was unable to understand and answer questions intelligently.

### A. Jay's Competency Under the Tender-Years Exception

¶73. The general rule in Mississippi is to allow children of tender years to testify if they are determined to be competent. *Mullins v. State*, 757 So. 2d 1027, 1032 (¶14) (Miss. Ct. App. 2000); *see* MRE 601(a) ("Every Person is competent to be a witness."). "A child is competent to testify if the court determines that the child has 'the ability to perceive and remember events, to understand and answer questions intelligently and to comprehend and

28

accept the importance of truthfulness.'" *Osborne v. State*, 942 So. 2d 193, 196 (¶9) (Miss. Ct. App. 2006) (quoting *Williams v. State*, 859 So. 2d 1046, 1049 (¶13) (Miss. Ct. App. 2003)). "Not only is an understanding of the importance of telling the truth indispensable to a showing of the competency of a young child, but the child must also appreciate the seriousness of the criminal charge and of the legal proceedings." *Graham v. State*, 120 So. 3d 1038, 1043 (¶22) (Miss. Ct. App. 2013) (citing *Edmond v. State*, 35 So. 3d 536, 539 (¶13) (Miss. Ct. App. 2009)).

¶74. The rule has been further discussed in *Tubbs*, 185 So. 3d at 368 (¶14). Our supreme court clarified that "the test is not whether the child can remember *the* event, but whether the child can 'perceive and remember events.'" *Id.* at 368 (¶15) (citing *Mohr v. State*, 584 So. 2d 426, 431 (Miss. 1991)). The Court further explained that because the child "remembered the judge from the previous trial[, s]he knew how old she was, that she went to school, and the names of her teachers," the trial court correctly found that she could remember events. *Id.* at 368 (¶15); *Mohr*, 584 So. 2d at 431. Our supreme court held that the issue of "whether . . . she could remember the exact event went more to the weight of her credibility, which was for the jury to evaluate." *Tubbs*, 185 So. 3d at 368 (¶17).

¶75. Our supreme court has also stated that the burden is on the party attempting to exclude the child's testimony to show that the child was incompetent at *that* time:

> In order to prevail in its effort to exclude the testimony of a child witness, the party opposing the testimony must show that ***at the time the court made its initial decision*** that it was apparent that the witness did not meet the criteria for testifying, not that the subsequent testimony was flawed or that the initial determination was possibly erroneous.

*Osborne*, 942 So. 2d at 196-97 (¶9) (emphasis added); *accord Williams*, 859 So. 2d at 1049 (¶13).

¶76.    In a prior decision, we held the trial judge did not abuse his discretion once he "listen[ed] to [the] testimony first hand, including an observation of the demeanor of the child," and then "determined that the child's testimony was at least trustworthy enough to permit the jury to hear it." *Barnett v. State*, 757 So. 2d 323, 329 (¶16) (Miss. Ct. App. 2000). We have also held that "notwithstanding [a child's] diminished I.Q.," there was no error in the court's ruling that the child was competent to testify when, "[a]t trial, she demonstrated her understanding of the importance of telling the truth and her understanding of the seriousness of the pending charges." *Edmond*, 35 So. 3d at 540 (¶19).  Then in *Barnes*, we explained that because the child "knew the difference between a lie and the truth and that telling a lie was wrong" and "knew why she was in court" and "remembered most of what had occurred," it was not an abuse of discretion for the trial court to find her competent to testify. *Barnes*, 906 So. 2d at 19-20 (¶¶13, 17).

¶77.    In this case, the trial judge ruled Jay competent to testify, finding that

> [a]lthough his memory may not be perfect and he may have made some inconsistent statements; nevertheless, the Court is convinced that he does have the ability to perceive and remember events; that he has the ability to understand and answer questions intelligently. I believe he did testify as well or better than many adults would and that he comprehends and accepts the importance of truthfulness.

¶78.    The record supports the trial judge's finding.  At the competency hearing, Jay demonstrated an ability to perceive and remember events when he stated that he, his mother, and Gardner were at the house that night.  Jay also exemplified an ability to understand and

30

answer questions. When Jay was asked whether he knew to correct the attorney if the attorney said something that was incorrect, he said yes because he knew about everything that happened that night. Lastly, Jay showed an ability to understand the importance of truthfulness, when he said, "A promise is saying that you will not do a certain thing, or you will do a certain thing." Jay further agreed that a promise to tell the truth is also a promise not to tell a lie. Based on the record, we find that the trial judge did not abuse his discretion by finding Jay competent to testify.

### B.      Jay's Credibility

¶79.    Gardner also argues that Jay was incompetent to testify because he gave inconsistent statements, and his testimony had been influenced by his grandmother because no child could testify in the manner that he did without such influence.

¶80.    At trial, the State asked Jay about the night of the shooting. The State asked Jay if he had discussed the shooting with anyone. Jay responded that he talked about what happened with his grandmother. Jay testified that he told his grandmother what happened but that she could not hear what he was saying because of all the noise that night.

¶81.    Then, the defense cross-examined Jay. The defense questioned Jay on how he knew that Gardner was the shooter. Jay responded, "He had the same dreadlocks as he had at the time, same body height, same body figure." The defense then asked Jay about his grandmother and whether Jay had heard his grandmother talk about the case. Jay stated, "Yes." Later, the defense asked if Jay had spoken with anyone else about what happened, and Jay said that he had spoken to his counselor. The defense asked Jay a series of questions

31

about the shooting, as well. The defense asked Jay if he was "standing up" when he was shot, and Jay replied, "Standing up." The defense asked if anyone else stayed in his bedroom with him, and Jay said, "No."

¶82. The defense then asked Jay about some of his statements he had previously given to the forensic interviewer. The defense asked, "Now do you recall telling somebody you were asleep when you got shot?" Jay said, "No." The defense asked if Jay remembered meeting with the forensic interviewer after he was released from the hospital, and he said "No." The defense asked Jay, "Do you remember telling anybody that you had some friends that got shot at the same time you did?" Jay said, "No." The defense further stated, "And it was a boy and girl or something to that [e]ffect?" Jay said, "The only people in the house were my mom, me and Marcus." The defense asked, "And do you recall telling anybody that your mom and Marcus were arguing about a fire outside?" Jay said, "No."

¶83. A video recording of Jay's forensic interview was played in open court. At the conclusion of the recording, the defense asked Jay if he heard the interviewer ask him who shot him, and he replied, "[M]y daddy when I was asleep." Jay said, "Yes." The defense asked Jay if he had heard the statement that "means there's something wrong with [Gardner]" from someone else before repeating it during the forensic interview. Jay said, "No." The defense then asked Jay about his statement to the interviewer that he had friends in the house with him. Jay admitted that he said that before but explained that "if there was more than just me in the room, there would be more blood marks and the pictures that were shown earlier, there's only one trail of blood." The defense then asked if it was "possible that other people

32

came in the house and shot [him] and ran off?" Jay testified that "[t]here's a chance that somebody else shot me, but that's not what I saw. Only one person shot me."

¶84. A challenge to the child's competency to testify is different from a challenge to the child's credibility. In *Osborne*, we stated that the question of whether the child "was coached to give the desired testimony" was a question for the jury. *Osborne*, 942 So. 2d at 197 (¶12); *Thorson v. State*, 895 So. 2d 85, 98 (¶17) (Miss. 2004) (citing *Sheffield v. State*, 749 So. 2d 123, 125 (¶9) (Miss. 1999)). We held that "clearly, the jury found [the child's] testimony to be credible." *Osborne*, 942 So. 2d at 197 (¶12).

¶85. After reviewing the testimony given, we conclude that Gardner was given the opportunity to thoroughly cross-examine Jay and bring the alleged coercion to the jury's attention. Further, whether Jay had been coerced by his grandmother or anyone else was a question for the jury to determine and then weigh the veracity of Jay's testimony. *See Tubbs*, 185 So. 3d at 368 (¶17). The jury may or may not have found Jay's testimony credible, but the trial court did not abuse its discretion by allowing Jay to testify.

### III. Cross-Examination of Andrew Perry

¶86. Gardner raises the issue that the trial court erred by limiting his cross-examination of Andrew Perry. Specifically, Gardner argues that "the jury did not hear that [Andrew] was facing ten years day for day or possible life without parole depending on which habitual provision he was indicted under."

¶87. "[A]n objection must be made with specificity to preserve error for appeal." *Stevens v. State*, 294 So. 3d 699, 706 (¶33) (Miss. Ct. App. 2020). "If the objection on appeal differs

from the objection at trial, the issue is not properly preserved for appellate review." *Id*.

Because Gardner did not mention to the trial court that he desired to cross Andrew on the fact

that he was "facing ten years day for day or possibly life without parole," he has waived this

argument on appeal. *Ambrose v. State*, 254 So. 3d 77, 102 (¶58) (Miss. 2018). Thus, this

issue is procedurally barred. *Stevens*, 294 So. 3d at 706 (¶34).

### IV.    Giving of State's Jury Instruction

¶88.    Gardner contends that the state's jury instruction failed to instruct the jury of the

essential "intent" element of murder, because the instruction used the phrase "unlawfully

designed" instead of "deliberate design." "To preserve a jury instruction issue on appeal, the

defendant must make a specific objection to the proposed instruction to allow the [circuit]

court to consider the issue." *Hodges v. State*, 285 So. 3d 711, 720 (¶35) (Miss. Ct. App.

2019) (quoting *Caffie v. State*, 269 So. 3d 1203, 1205 (¶11) (Miss. Ct. App. 2018)). "[T]he

failure to object to a jury instruction at trial waives the issue on appeal, and 'the issue is

barred from review absent plain error.'" *Brown v. State*, 336 So. 3d 134, 144 (¶26) (Miss.

Ct. App. 2020) (quoting *Willie v. State*, 204 So. 3d 1268, 1278 (¶28) (Miss. 2016)). Since

Gardner did not object to the jury instruction at trial and did not file a post-trial motion,

Gardner has waived this issue; however, we may apply the plain error doctrine. *See id.*

¶89.    "[T]he State has to prove each element of the crime beyond a reasonable doubt, [and]

the State also has to ensure that the jury is properly instructed with regard to the elements of

the crime." *Hodges*, 285 So. 3d at 720 (¶36) (quoting *Bolton v. State*, 113 So. 3d 542, 544

(¶4) (Miss. 2013)); *accord Chesney v. State*, 165 So. 3d 498, 503 (¶10) (Miss. Ct. App.

2015). Thus, "the failure to instruct the jury on the essential elements of the crime is plain error." *Id.* When applying the plain-error rule, this Court must determine (1) whether the trial court deviated from a legal rule; (2) whether the error is plain, clear, or obvious; and (3) whether the error prejudiced the outcome of the trial. However, when there is no "binding authority" or "clear legal rule" disapproving of such instruction, "the instruction cannot be 'plain error.'" *Brown*, 336 So. 3d at 145 (¶30).

¶90. Jury instruction S3 read:

> Marcus Gardner is charged in count two with attempted murder. If you find beyond a reasonable doubt from the evidence in this case that on or about August 1st, 2017, in Noxubee County, Marcus Gardner unlawfully designed to commit murder by shooting [Jay], an overt act towards committing murder, but Marcus Gardner did not actually complete the murder or was prevented from completing the murder because [Jay] survived the gunshot wounds, then you shall find Marcus Gardner guilty as charged of attempted murder in count number two . . . .

The function of the word "deliberate" was to instruct the jury that the defendant must have intended to commit the crime of murder. *See Jones v. State*, 710 So. 2d 870, 877 (¶30) (Miss. 1998). The jury was properly instructed on this element by the use of the word "design." Our supreme court has defined these terms:

> "Deliberate" always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan, contemplate deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent.

*Id.* (internal quotation marks omitted).

¶91. On its face, the State has inserted the word "unlawfully" where the word "deliberate" would typically be used if tracking the language of the first-degree statutory section. Miss.

35

Code Ann. § 97-3-19(1)(a) (Supp. 2017). However, the jury instruction given was asking the juror to determine whether Gardner committed *attempted* murder, not first-degree murder:

> Every person who shall design and endeavor to commit an act which, if accomplished, would constitute an offense of murder under Section 97-3-19, but shall fail therein, or shall be prevented from committing the same, shall be guilty of attempted murder and, upon conviction, shall be imprisoned for life in the custody of the Department of Corrections if the punishment is so fixed by the jury in its verdict after a separate sentencing proceeding.

Miss. Code Ann. § 97-1-7(2) (Rev. 2014).

¶92. When comparing the attempt section, 97-1-7(2), to the state's jury instruction, it is not plainly or clearly obvious that the State should have included the word "deliberate" because section 97-1-7(2) does not contain the word "deliberate." *Id*. ("[S]hall design and endeavor to commit an act[.]"). There is no rule prohibiting the use of the phrase "unlawfully designed" in place of "deliberate design," at least under the attempt statute. Additionally, the jury could have understood from the instructions that having the "design" to commit an act indicated that the action was "deliberate." The "plan[ing], calculat[ing], [and] contemplat[ing]" an action necessitates that one is "ful[ly] aware[] of what one is doing." *Jones*, 710 So. 2d at 877 (¶30). Thus, we do not find it was *obvious* that the State committed any error by omitting the word "deliberate" as stated in the statute. Accordingly, Gardner has failed to show that he has met the first prong of the plain error doctrine. Again, he is procedurally barred from raising this issue. *Brown*, 336 So. 3d at 145 (¶31).

## CONCLUSION

¶93. Gardner received a fair trial, and none of his alleged errors violated his constitutional

36

rights. The trial court did not abuse its discretion by allowing the juror to remain on the jury. Further, the trial court appropriately held a competency hearing and ruled that the minor child was competent to testify. Gardner waived the issue regarding the cross-examination of the witness Andrew Perry. Likewise, Gardner's issue regarding the jury instruction S3 has not been properly preserved for appellate review because Gardner failed to object to the State's jury instruction, and we find no plain error. Accordingly, we affirm Gardner's convictions and sentences.

¶94. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., McDONALD, McCARTY AND SMITH, JJ., CONCUR. WILSON, P.J., AND EMFINGER, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GREENLEE AND LAWRENCE, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**